# THE AMERICAN LIVE STOCK COMMISSION COMPANY

*v.*

# THE CHICAGO LIVE STOCK EXCHANGE.

*Filed at Ottawa October 31, 1892.*

· 1.  CORPORATION—*rights under assigned certificate of membership.*
Where the by-laws of a corporation not for pecuniary profit provide for
the admission of members on the written application of the party seek-
ing the same, indorsed by two members, upon approval by not less than
seven ballot votes, on the payment of the initiation fee, or the presen-
tation of a certificate of membership duly transferred, and by signing
an agreement to abide by the rules and regulations, the ownership
of such a certificate will not constitute the holder a member, or entitle
him to any rights as such.

2.  The only way in which the holder can avail of such certificate is
by tendering it in lieu of the initiation fee, in case he or his agent, on
proper application, shall be admitted to membership; or in case such
application is denied, then by selling it for a consideration to some
other person who may desire to become a member.

3.  The Chicago Live Stock Exchange, a corporation not for pecu-
niary profit, has the right to adopt a rule providing the terms and con-
ditions upon which persons may be admitted to membership therein,
and when it has exercised that right, and prescribed the mode in which
membership can be obtained, no one can justly claim to be a member
who has not been admitted in such mode.

4.  SAME—*power of a court of chancery to compel admission to mem-
bership.*  A court of equity has no power to compel the directors and
officers of a corporation organized not for pecuniary profit to vote for
the admission of a person to membership.  They are entitled to a free-
dom of judgment which is not subject to judicial compulsion.  In other
words, the court will not undertake to force upon such a corporation a
member, against the will of those whose duty it is to pass upon appli-
cants for membership.

5.  SAME—*stranger may not complain of its rules and regulations.*  One
not a member of such a corporation, and not entitled, either directly or
indirectly, to any of the rights arising from membership therein, can
not be heard to complain of any of the rules adopted by it for the gov-
ernment of the conduct of its own members, or to invoke the aid of a
court of equity to restrain the enforcement of such rules.

6.  A voluntary association, whether incorporated or not, has, within
certain well defined limits, power to make and enforce by-laws for the

government of its members, and such by-laws are ordinarily matters between the association and its members, alone, and with which strangers have no concern. If it passes by-laws which are unreasonable, or contrary to law, or against public policy, and attempts to enforce them against an unwilling member or minority, a court of equity may grant relief against their enforcement. But mere strangers may not demand such relief.

7. SAME—*by-laws in restraint of trade.* A by-law of a corporation whose members are engaged in the buying and selling of live stock in a public market open to all, which prohibits its members from dealing with certain other classes of corporations or their agents, if construed to be in restraint of trade, and therefore against public policy, is illegal only in the sense that the courts will not enforce the same.

8. CONTRACTS — *in restraint of trade—enjoining performance.* The law does not prohibit the making of contracts in restraint of trade,—it merely declines to recognize their validity, or to enforce them. A party to such a contract is not bound to perform it, but he may perform it if he sees fit, and his doing so exposes him to no legal animadversion.

9. MARKETS—*courts can not declare them public.* The mere fact that the business of a particular market owned by a private corporation has become so large as to influence the commerce of a large section of the country, will not give the courts any power to declare such market public, and impressed with a public use, or to apply to it any rules of public policy peculiar to that class of markets. That power belongs alone to the legislative department of the State.

10. CHANCERY PRACTICE—*dismissal of bill on motion to dissolve injunction.* Where a bill seeks no other relief except an injunction, a motion to dissolve the injunction will have the same effect as a demurrer to the bill for want of equity, and the court, on sustaining such motion, may properly dismiss the bill.

APPEAL from the Appellate Court for the First District;— heard in that court on appeal from the Circuit Court of Cook county; the Hon. M. F. TULEY, Judge, presiding.

This was a bill in chancery, brought by the American Live Stock Commission Company against the Chicago Live Stock Exchange and H. D. Rogers, for an injunction. A preliminary injunction having been issued, the Chicago Live Stock Exchange appeared and demurred to the bill, and the demurrer being overruled, it filed an answer and entered its motion to dissolve the injunction. Said motion being heard on

bill, answer and the affidavits filed by the respective parties, was sustained. The defendant then filed its suggestion of damages, and upon the evidence adduced, the court awarded the defendant damages sustained by reason of suing out the injunction in the sum of $1250, and rendered its decree therefor, and also entered a decree dismissing the bill at the complainant's costs for want of equity. Both decrees have been affirmed by the Appellate Court on appeal, and the present appeal is from said judgment of affirmance.

The facts, as alleged in the bill, so far as they need be stated, are these: The Chicago Live Stock Exchange is a corporation organized under the laws of this state, March 13, 1884, by certain commission merchants engaged in the business of buying and selling live-stock for others on commission, and was organized in the interest of commission merchants and dealers in live-stock at the Union Stock Yards, a public live-stock market in Cook county, Illinois. Upon the organization of said Exchange, the commission merchants and buyers of live-stock at the Union Stock Yards became and are now members thereof, and the members of the Exchange have combined and confederated in order to control the selling of the live-stock which may arrive at said market, and by reason of such combination, it has become impossible for one not a member of the Exchange, to sell live-stock in said public market, for, while the rules of the Exchange allow its members to buy from owners of live-stock, the usage of owners not to accompany their stock, and their lack of acquaintance with purchasers and dealers, and of familiarity with the methods of dealing, render it necessary to employ a representative to sell their stock, and by the rules of the Exchange, such representative must be a member thereof, as purchasers will buy of no others than members, or the owners of stock.

In the year 1889, there were shipped to the Union Stock Yards and sold in said market 3,023,281 cattle, 123,968 calves, 5,998,526 hogs, 1,823,469 sheep, 79,926 horses, mak-

ing a total of 11,117,170 head of live-stock, said live-stock having been raised and forwarded to the Union Stock Yards by the farmers of Illinois, Wisconsin, Michigan and other States and Territories, whereby the live-stock market at said stock-yards has become and now is the largest market of live-stock in the world.

Said Exchange, shortly after its organization, adopted a body of rules and by-laws which, in 1889, were codified into a system.   Of these rules, rule 8, fixed the qualifications and mode of admission of members, and rule 9 established certain minimum rates of commissions to be charged by members for selling live-stock.   The bill alleges that the rates of commission thus fixed are unjust and unreasonable to those engaged in raising live-stock, and who are compelled by circumstances to ship the same to said market, that market having long since become a public market, the prices upon which to a great degree fix the value of live-stock throughout the United States; that under the alleged purposes for which said corporation was formed, its members have joined and confederated together to coerce persons sending stock to said stock-yards to pay an unreasonable price to them for selling, or to prevent such stock from being sold until a member of the Exchange should be employed to sell the same at unreasonable rates of commission; that a great proportion of the live-stock shipped to said market is purchased by four persons or firms, at least to such an extent that their refusal to purchase from an individual or firm renders it impossible for such person or firm to sell stock in said market, and each of said buyers is a member of the Exchange, and submits to and is bound by its rules and regulations, and will refuse to purchase from persons who are not in harmony with the Exchange, and will refuse to trade with or purchase from persons or corporations, when forbidden to do so by the Exchange.

The bill further alleges that this condition of things existed on the 1st day of January, 1889, and had so existed for a

number of years prior thereto, and that a large number of stock producers in the States and Territories aforesaid, feeling the grievances to which they were and had been subjected, conferred together as to the best means of relief from the oppressions aforesaid, and determined to organize and form a corporation for the purpose of selling their own stock, by having their corporation become a member of the Exchange, so as to handle and sell their own stock on said public market, and after selling such stock as might be consigned to it by its shareholders and others, and charging the regular commissions therefor, to relieve its shareholders of such excessive charges, by returning to them by way of dividends, all sums their corporation should receive in excess of the expense of such handling and selling; that in pursuance of such arrangements, and in the interest of said stock-producers, the American Live Stock Commission Company was organized under the laws of this State, March 2, 1889; that after its organization, its board of directors appointed H. D. Rogers its manager at Chicago, and gave him authority to attend to its business and see to receiving such live-stock as might be consigned to it, and sell the same for said company, in accordance with the rules and by-laws of the Exchange; that in order to sell live-stock at the Stock Yards Market, it was found to be necessary for the complainant corporation to become a member of the Exchange, and for that purpose, and under that necessity, it caused its manager to purchase from the legal holder thereof a certificate of membership and caused the same to be transferred to its manager, and for which it paid the sum of $100, and thereupon its manager signed an agreement to abide by the rules, regulations and by-laws of the association and all amendments that might in due form be made thereto, in conformity with the requirements of rule 8 of said Exchange, and thereupon the Exchange, at the complainant's request, took up said certificate so purchased, and issued to Rogers, as such manager, to be held by him in trust

for the complainant, a new certificate of membership, admitting him, under the description of "H. D. Rogers, Manager," to full and regular membership and standing in the Exchange.

It is further alleged that, by virtue of such membership, Rogers represented the complainant, as its manager, in the Exchange, selling stock and doing other necessary business for it, until December 14, 1889, when the office of manager was abolished, whereupon Rogers resigned and Eli Titus was appointed general manager of the complainant; that Rogers afterwards, and about January 5, 1890, having ceased to act for the complainant, assigned said certificate of membership in blank and delivered it to the complainant; that afterwards, and on or about January 18, 1890, without the knowledge or consent of the complainant, he surreptitiously and secretly abstracted said certificate from the complainant's desk, and now has the same, and refuses to surrender it to the complainant, and threatens to hold it and enjoy the privileges of membership in the Exchange which it affords, as though he was the owner thereof; that the complainant has requested the Exchange to issue to its general manager a duplicate certificate, and thereupon the Exchange investigated the complainant's claim and admitted that it was the owner of said certificate, but refused and now refuses to issue to the complainant such duplicate, or any other evidence of its right to membership in the Exchange; that the Exchange now threatens to deny the complainant the privileges of the Exchange, and to notify its members to refuse to purchase live-stock from the complainant, and to expel the complainant from membership, and has conspired with Rogers to have him withhold said certificate, and thus deprive the complainant of its rights therein.

The bill further alleges that the object of the complainant's organization was to enable its shareholders, all of whom are feeders of live-stock and shippers of the same to said market, to procure the sale of such live-stock at reasonable cost and

under favorable circumstances, and to the end that this might be done at the lowest cost, it has offered to and has sold on said market live-stock for other producers, and has made the charges therefor in strict accordance with the rules of the Exchange, and after making such charges and collecting the same, at the end of the year it had earned, as the result of its services, after deducting all expenses, the sum of $40,493.83, and thereupon, in December, 1889, it proceeded to declare a dividend, and distribute its net earnings amongst its shareholders, in accordance with the purpose announced in its articles of incorporation, that is to say, sixty-five per cent of such net earnings to its shareholders in the ratio of the amount of live-stock shipped by each respectively, and the remaining thirty-five per cent in proportion to the number of shares of stock owned by them; that such division of profits was not in conflict with any rule of the Exchange, and was just and equitable, and injurious to no one, and that the complainant is obliged by law to so distribute its net earnings.

It is also alleged that the members of the Exchange, further conspiring to reap unreasonable profits, and to prevent the complainant's shareholders from obtaining the sale of their stock at small expense, on February 4, 1890, against the complainant's objection, amended its said rule 8, by adding thereto the two following paragraphs, viz:

1. "No person shall be received for membership in this Exchange who in any manner represents or acts for, either as an officer, agent or broker, or commission merchant, any other live-stock corporation or exchange, whose charter regulations, rules or by-laws provide for discrimination in rates or charges or commissions, between stockholders or other patrons or customers, whether under guise of dividends, drawbacks or any other scheme or device whatever.

2. "If any member of this Exchange shall hereafter act for, either as officer, agent, broker or commission merchant, any other live-stock corporation or exchange, whose charter, regu-

lations, rules or by-laws provide for discrimination in rates or charges or commissions between stockholders or other persons or customers, whether under the guise of dividends, drawbacks or any other scheme or device whatever, he shall be liable to suspension for the first offense and to expulsion for any subsequent offense."

That at the same time, the Exchange amended its rule 9, by adding thereto the following:

"Nobody in this Exchange shall buy or cause to be bought at the Union Stock Yards, Chicago, Illinois, from any agent, individual, firm, incorporation, or other live-stock commission company, who are or may be regularly selling live-stock for non-residents on commission, unless some one or more of the members of such firm or stockholders of such company are members in good standing of this Exchange, provided, however, that any party or parties beginning a live-stock commission business at said yards shall not be considered subject to this rule, until thirty days from the date of their beginning such business, and provided further, that nothing herein contained shall be construed as in any manner prohibiting any party from selling his own live-stock on the market of such stockyards, or any member of this Exchange from buying such stock of the owner."

The bill prays for an injunction restraining Rogers from using or disposing of said certificate of membership, and restraining the Exchange from issuing any certificate in place thereof to any other than the complainant or its authorized general manager; that said amendments to said rules and by-laws of the Exchange be held to be null and void; that the Exchange be enjoined from notifying its members or any of them not to purchase live-stock in said general market or elsewhere from the complainant, and from in any manner endeavoring to prevent the complainant and its agents from selling live-stock on the market of the Union Stock Yards, and from taking any steps to try the complainant for any sup-

posed violation of said rule 9, or any of said amended by-laws, and that on final hearing, said injunction be made perpetual, and said Rogers be required to surrender said certificate, and the Exchange be required to issue said certificate to the complainant, and that the complainant be permitted to enjoy its privileges, unvexed by any unjust, unreasonable or illegal restraints, and also a general prayer for relief.

The Chicago Live Stock Exchange answered denying the equities of the bill, and particularly denying, among other things, that its members had confederated to control the selling of live-stock at the Union Stock Yards by its own members or otherwise, or that it had interfered or attempted to interfere with the action of any other persons not members of the Exchange, in buying or selling at said yards, or that it was impossible for one not a member to sell live-stock in said market, or that it was necessary for shippers of cattle to said yards to employ a representative to sell their stock. The answer alleged that the Union Stock Yards Company is a private corporation, and is accustomed to forbid and prevent such persons or corporations as it sees fit from entering upon or doing business at its stock-yards.

The answer also alleges that it is a matter of no concern, except to the defendant and its members, whether the defendant has adopted a body of rules or by-laws or has altered them, nor as to what rules it has adopted; that the complainant is not a member of the defendant corporation, nor interested in its rules, and has no right to inquire into them or call them in question; that it is no concern of the complainant or any one else as to what commissions are charged by commission merchants, nor as to what rules or regulations the defendant may have made or shall make as to the rate of commissions nor as to what rules or regulations it shall make for the government of its affairs or that of its members. It denies that the rates of commission prescribed by the defendant's rules are unjust or unreasonable, but avers that they

are low minimum rates, and the lowest that any reputable or responsible merchant can afford to charge for handling stock.

The answer further avers that the establishment by the members of the Exchange of uniform rates of commission was essential to the correction and prevention of certain evils in their business of buying and selling live stock on commission at said stock yards; that prior to the adoption of the rule establishing such uniform rates, great demoralization and abuses had grown up in said business, but that they had in a great measure been corrected by that rule.

The defendant denies that the refusal of any four firms doing business at the stock-yards to purchase of an individual, renders it impossible for such individual to sell his stock at said stock-yards; that the defendant does not know whether or not purchasers of live-stock who are members of the Exchange will refuse to purchase from persons who are not in harmony with the Exchange, or whether they will refuse or decline to trade with or purchase from persons or corporations, or from agents, when forbidden to do so by the Exchange.

The answer charges that the promoters of the complainant corporation conspired to defeat and destroy the work and benefit of the Exchange, and to injure the business of its members and prevent equality among shippers in the matter of commissions, and to get discriminations in rates of transportation and other undue advantages, and to control and raise the price of live-stock, and that for these purposes that corporation was formed; that the complainant's shareholders confederated to control the live-stock market of Chicago, and the market price of beef, and have conspired to injure the commission merchants at the stock-yards, and to avoid and defeat the restrictions and rules of the Exchange, and at the same time get to themselves the benefit of said Exchange, and while said corporation nominally charges its shareholders, as well as others, the full rates of commission fixed by the rules of the Exchange, it returns to its shareholders and distributes

among them sixty-five per cent of its net earnings, in the ratio of the amount of live-stock shipped by each; that said distribution of sixty-five per cent of its net earnings was an attempted evasion of rule 9 of the Exchange, and if such evasion were permitted, other members of the Exchange who are bound by said rule would be put to a great disadvantage and would be unable to meet said competition.

The answer avers that it is not and has never been necessary, in order to buy or sell stock on commission at the stock-yards, that the person so attempting to do, should become a member of the Exchange, and that it was and is not necessary that the complainant should become a member of the Exchange; that the defendant has never attempted to prevent any person or corporation from buying or selling live-stock at said yards who was not a member of the Exchange, and does not intend so to do, and that its members have not confederated together to prevent any person or corporation not a member from buying or selling live-stock at said yards, or to interfere with them in their action in that behalf.

It admits that, at the date alleged, Rogers presented to the defendant an application for and was admitted to membership, but the defendant denies that the complainant ever became a member, or that Rogers was admitted at its request; that defendant does not know who Rogers represented, but that his membership in the Exchange was merely personal to himself; that when he applied for membership, the fact that he was to act for a corporation which was to divide its earnings as the complainant has done was, at the instance of the complainant, and for the purpose of getting its agent into said Exchange, concealed from the defendant.

The answer admits that Rogers signed the blank assignment on the back of his certificate of membership, but denies, on information and belief, that he delivered it so endorsed to the complainant. It also denies that the complainant has requested the defendant to issue said certificate to Titus, or

that the complainant or Titus has applied for membership, as provided by said rule 8, or that the defendant is refusing to issue to the complainant a certificate or other evidence of its rights in the Exchange, or that the defendant has ever threatened to deny the complainant such rights, or threatened to notify any of the members of the Exchange not to purchase live-stock from the complainant, or to expel the complainant from its pretended membership, as those questions have not arisen for its consideration, but the defendant now denies that the complainant is a member of the Exchange, or that it has a right to become a member thereof.

Both the bill and answer are verified by affidavits, and in addition thereto, the parties produced and read at the hearing of the motion to dissolve the injunction a large number of affidavits of officers and members of the two corporations in question, and of shippers of live-stock to the stock-yards market and of dealers in that market, corroborative of the allegations of the bill and answer respectively, and upon the case thus made, an order was entered dissolving the injunction, and a further order was subsequently entered dismissing the bill for want of equity.

Prior to the submission of the motion to dissolve the injunction, however, a hearing was had as to defendant Rogers, upon the bill taken *pro confesso,* and at that hearing the court found that the certificate of membership in the Exchange held by Rogers was paid for with the complainant's funds, and was held by Rogers in trust for the complainant, and it was thereupon decreed that said certificate was the property of the complainant, and Rogers was ordered, within thirty days, to surrender and deliver the same to the complainant, and he was also perpetually enjoined from exercising any further privileges or rights under said certificate, as against the complainant.

The further facts necessary to a proper understanding of the case will be found sufficiently stated in the opinion of the court.

Mr. WILLIAM BROWN, for the appellant:

It was improper to dismiss the bill without a hearing after answer was filed.   *Cleaver* v. *Smith*, 114 Ill. 114; *Thomas* v. *Adams*, 30 id. 37; *Johnson* v. *Railway Co.* 111 id. 413; *Richards* v. *Railway Co.* 124 id. 517.

Neither the misjoinder of parties, nor the want of parties, nor the existence of an adequate remedy at law, is ground for dismissal of bill after answer filed and issue taken.   *Stelzich* v. *Weidel*, 27 Ill. App. 177; *Holden* v. *Holden*, 24 id. 106; *Dunlap v. Allen*, 90 Ill. 108.

Persons acquiring property through fraud are trustees. Pomeroy's Eq. secs. 136, 155, 910-920, 1055.

A *cestui que trust* may have an injunction to prevent the trustees from proceeding in an unauthorized manner in the use of the trust property.   Pomeroy's Eq. secs. 1058, 1340; 2 Perry on Trusts, sec. 816.

It is a rule that *ex post facto* by-laws are void.   2 Wait's Actions and Defenses, 327, 328; *Pullman* v. *Fire Department*, 31 Mich. 458; *Howard* v. *Savannah*, 7 Charlt. 173; *People* v. *Crockett*, 9 Cal. 112; *Kent* v. *Mining Co.* 78 N. Y. 158.

A corporation can not expel a member except for one of three causes:   First, for offenses having no relation to the member's corporate duty, but of so infamous a character as to render him unfit for the society of honest men; second, for offenses against the member's duty as a corporator; and third, for offenses compounded of the two.   *Evans* v. *Philadelphia Club*, 50 Pa. St. 107; *People* v. *Board of Trade*, 45 Ill. 112; *People* v. *Medical Society*, 32 N. Y. 187; 2 Brewster, 571; 22 Mich. 86; *Dickinson* v. *Chamber of Commerce*, 29 Wis. 670; *Graham* v. *Chamber of Commerce*, 20 id. 78; *Belton* v. *Hatch*, 109 N. Y. 593.

Contracts in restraint of trade are void.   2 Kent's Com. 638, note 1; *Slater* v. *Allen*, 5 Denio, 434; *Hooker* v. *Vandewater*, 4 id. 349; *Craft* v. *McConoughy*, 79 Ill. 346; *Hilton* v. *Eckersby*, 32 E. L. & E. 198; *Gas Light Co.* v. *Gas Light Co.*

121 Ill. 530; *Salt Co.* v. *Guthrie,* 35 Ohio St. 666; *People* v. *Fisher,* 14 Wend. 10.

The by-laws are void, as being contrary to both the statute and the common law. *Railroad Co.* v. *Kendall,* 31 Mass. 470; *United States* v. *Hart,* 1 Peters' C. C. 390; *Hayden* v. *Noyes,* 5 Conn. 391; 35 Pa. St. 151.

As an illustration of what by-laws are void as being in restraint of trade, we beg leave to refer to the cases of *King* v. *Coopers' Co.* 7 T. R. 543; *Freeholders* v. *Barber,* 2 Hals. 64; *Clark* v. *LeCrew,* 9 B. & C. 52; *Durham* v. *Rochester,* 5 Cow. 462; *People* v. *Medical Society,* 24 Barb. 570; *Moon* v. *Bank,* 52 Mo. 377; *Sawyer* v. *Louisville Ass.* 1 Duv. 144.

A by-law which interferes with the sale of property is void, and these by-laws certainly interfere, in the most pronounced manner, with the efforts of these stock producers to sell their stock without employing the members of the Exchange at ruinous rates.    2 Wait's Actions and Defenses, 328; *Driscoll* v. *Manufacturing Co.* 59 N. Y. 96.

The act of the members of the Exchange in boycotting the American Live Stock Commission Company amounts to a criminal conspiracy, under the common law and under the statutes of Illinois.    Rev. Stat. chap. 38, sec. 73.

All combinations or confederations wrongful to the privileges of an individual, whether the intention is to injure his personal property or character, are by the common law adjudged conspiracies.    Archbold's Crim. Pl. and Pr. (8th ed.) 1830.

Boycotting amounts to conspiracy, and is indictable.

A combination amongst steamboat owners to prevent A from obtaining a cargo is indictable.    *Steamship Co.* v. *McGregor,* L. R. 15 Q. B. Div. 476; *Regina* v. *Parnell,* 14 Cox's Crim. Cas. 508.

A combination to injure one's business is a conspiracy. 4 Cyclopedia of Law, 616; *Carew* v. *Rutherford,* 106 Mass. 1; *State* v. *Donalson,* 32 N. J. L. 157.

The combination which has been described and proven against the members of the Exchange, and the by-laws which were adopted by them, come within the exact definition of "forestalling" and "monopoly." Their conduct brings them within the common law description of these offenses. 2 Blackstone's Com. b. 4, p. 158, tit. "Offenses Against Public Trade."

Rules of a trade society against employing any one who has been dismissed from other societies are void, as an unreasonable restraint on trade.   3 Cyclopedia of Law, 886.

Messrs. MILLER, STARR & LEMAN, for the appellee:

The bill of complaint was properly dismissed for want of equity, upon the motion to dissolve.   The bill was for an injunction, and on its face showed complainant not entitled to relief, and in such case it is proper to dismiss the bill on the hearing of the motion.   *Titus* v. *Mabee*, 25 Ill. 257; *Shaw* v. *Hill*, 67 id. 455; *Weaver* v. *Poyer*, 70 id. 567; *Reynolds* v. *Mitchell*, Beecher's Breese, 177; *Prout* v. *Lorner*, 79 Ill. 331; *Baird* v. *Foreman*, Beecher's Breese, 385; 2 High on Injunctions, secs. 1076, 1580.

Appellant never applied for membership, and membership in this association is a personal privilege.   *Smith* v. *Barclay*, 107 Ill. 349.

There are no facts whatever alleged in the bill showing that the Exchange had ever interfered, in any way, with any legal rights of complainant, and without such facts clearly set up, the complainant can not invoke the aid of equity to interfere with it or its rules; and it would make no sort of difference whether the Exchange, or its rules, or action or contemplated action, are legal or illegal, or against public policy or the public interests.   Equity does not extend its jurisdiction to offenses against the public.   *Sparhawk* v. *Railway Co.* 54 Pa. St. 401; *Ganse* v. *Perkins*, 69 Am. Dec. 728; *Railway Co.* v. *Central Stock Yards*, 6 L. Rep. Ann. 855; Morawetz on Corporations, secs. 1041, 1132, note 1; High on Injunctions, sec. 23.

The law is well settled that a court of equity will not interfere with the action or contemplated action of an association like this, upon the question of membership or expulsion from membership therein.   *Sturges* v. *Board of Trade*, 86 Ill. 441 ; *Baxter* v. *Board of Trade*, 83 id. 146 ; *Robinson* v. *Yates City Lodge*, 86 id. 598 ; *Pitcher* v. *Board of Trade*, 20 Ill. App. 323 ; *Gregg* v. *Medical Society*, 111 Mass. 185 ; *Thompson* v. *Society of Tammany*, 17 Hun, 305.

A court of equity does not, at the suit of private persons, entertain suits to restrain illegal acts or illegal combinations, or violations by corporations of corporate duty.   The criminal courts are open to complaints of violations of law.   The State is the party to prosecute defaults of corporations for their violations of corporate duty.   Private parties can not do so in a court of equity for injury to the public.   *Sparhawk* v. *Railway Co.* 54 Pa. St. 401 ; *Billard* v. *Echart*, 35 Kan. 611 ; *Railway Co.* v. *Central Stock Yards*, 6 L. Rep. Ann. 855 ; *Ganse* v. *Perkins*, 69 Am. Dec. 728 ; High on Injunctions, sec. 23 ; Morawetz on Corporations, secs. 1041, 1042, note 1.

A person who is not a member of an association can not attack its rules, which bind no one not a member.   *Ward* v. *Johnson*, 95 Ill. 215 ; Green's Brice's Ultra Vires, 673, note a.

Mr. Chief Justice Bailey delivered the opinion of the Court :

This case, so far as it relates to defendant Rogers, having been disposed of in the complainant's favor by a decree from which no appeal has been taken and of which no complaint is made, the only questions now presented are those which relate to the equities which the complainant is seeking to enforce as against the Chicago Live Stock Exchange.   Said Live Stock Exchange is a corporation, not for pecuniary profit, organized March 13, 1884, under the laws of this State, the objects for which it was organized, as declared by its articles of incorporation, being :   "To establish and maintain a commercial ex-

change; to promote uniformity in the customs and usages of our merchants; to provide for the speedy adjustment of all disputes between its members; to facilitate the receiving of live-stock, as well as provide for good management and the inspection thereof, thereby guarding against the sale or use of unsound or unhealthy meats; to secure to members a corporation in furtherance of their legitimate purposes." Said corporation has no capital stock, and is itself engaged in no commercial business, but limits its corporate enterprise to furnishing to its members facilities for carrying on, each for himself, the business of buying, selling and dealing in live-stock, meats and other like commodities, and to adopting and enforcing by-laws, rules and regulations by which the business of its members shall be conducted and governed.

The location of the Exchange, and the place where its members carry on their business of dealing in live-stock under and in subordination to its rules, is the Union Stock Yards, Chicago. The Union Stock Yards and Transit Company, to which the stock-yards belong, is also a private corporation, not itself engaged in the business of buying, selling or dealing in live-stock, but merely owning and furnishing very extensive stock-yards, to which live-stock is shipped in great quantities from all parts of the West for sale, and where buyers and sellers of live-stock, acting either for themselves or as the representatives of others, resort for the purpose of carrying on their business. The Union Stock Yards have thus become the place to which nearly all the live-stock shipped to Chicago for sale is consigned, and where, as it is said, more live-stock is annually bought and sold than in any other market in the world.

No corporate relation exists between the Stock Yards and Transit Company and the Chicago Live Stock Exchange, the latter corporation being formed merely by an association of commission merchants engaged in selling live-stock for others on commission, and parties engaged in the business of buying live-stock for themselves, in said market. The evidence shows

that the commission merchants and buyers representing much the largest portion of the business done at said market are members of the Exchange, though many parties, both sellers and buyers, are not members.

The case sought to be made by the complainant is presented under two aspects :   First, it is claimed that, either by itself or through its general manager, the complainant is, or is entitled to be, admitted a member of the Exchange, and it accordingly prays for an injunction restraining the Exchange from taking any steps to try the complainant for a violation of its rules, or to impose upon the complainant's privileges as a member any illegal or unreasonable restraints, and it also prays that the certificate of membership in Roger's hands be issued to the complainant.   Secondly, it claims that, if it is not a member and entitled to the privileges of membership, the Exchange should be restrained from putting in force certain rules it has adopted for the government of its own members, and particularly its amendments to rules 8 and 9.

We are unable to see upon what principle it can be justly claimed that the complainant is a member of the Exchange or entitled to the privileges of membership, or that it is in a position where it can insist upon being admitted to membership as a matter of right.   Whatever may have been its rights while Rogers, its manager, was a member, those rights no longer exist, as, by its own admission, Rogers is no longer its manager, and is no longer a member of the Exchange.   Nor can there be any just pretense that the complainant itself is a member or has ever applied for membership.   The Exchange is a corporation having rules or by-laws determining the qualifications for membership, and prescribing the mode in which members may be admitted, and there is no pretense that the complainant has ever brought itself within the terms of said rules or by-laws, so as to be entitled to membership.   Rule 8 of the Exchange provides as follows :

"On and after May 1, 1884, any person of good character and credit, and of legal age, whose interests are centered at the Union Stock Yards, on presenting a written application, indorsed by two members, and stating the name and business avocation of the applicant, after ten days' notice of such application shall have been posted on the bulletin of the Exchange, may be admitted to membership in the association, upon approval by at least seven affirmative ballot-votes of the board of directors, and upon payment of an initiation fee of $500, or on presentation of a certificate of unimpaired or unforfeited membership, duly transferred, and by signing an agreement to abide by the rules, regulations and by-laws of the association, and all amendments that may, in due form, be made thereto."

Said association had an undoubted right to adopt this rule, and as it prescribes the mode and the only mode in which membership in the Exchange can be obtained, no one can justly claim to be a member who has not been admitted in the mode thus prescribed.

It may well be questioned whether, under this rule, a corporation, in its corporate character, can be admitted to membership in the Exchange, as said rule seems to contemplate only the admission of natural persons. But even if that were otherwise, there is no pretense that the complainant itself has ever made application for membership, or that any of the subsequent steps necessary to vest an applicant with the character and rights of membership have been taken, or that they have resulted favorably to the complainant. Nor is it pretended that since Rogers ceased to be the complainant's manager and thereby ceased to be its representative on the Exchange, any formal application for membership has been made by Titus, its general manager, or by any other person in its behalf, but the evidence, on the other hand, is clear and undisputed that no such application has been made. The fact alleged in the bill, if it be a fact, that the complainant

has requested the Exchange to issue the certificate of membership formerly held by Rogers to Titus avails the complainant nothing, as the Exchange is under no obligation to admit a member upon such request, but can, in conformity with its rules, admit to membership only upon formal application duly presented and approved in the manner in said rules prescribed. The equitable or even legal ownership of the unimpaired or unforfeited certificate of membership formerly issued to Rogers and duly transferred to it, does not constitute it a member, or entitle it to any rights as such. The only way in which the complainant can avail itself of such certificate is, by tendering it in lieu of the prescribed initiation fee in case the complainant or its representative, on proper application, shall be admitted to membership, or, in case such application should not be granted, then by selling it for a consideration to some other person who may desire to become a member.

It may also be noticed, in immediate connection with the point now under consideration, that a court of chancery has no power to order the Exchange to issue the certificate of membership formerly held by Rogers to the complainant or its general manager, so as to constitute it or him a member. Before an applicant can become a member, his application must, among other things, be indorsed by two members, and must receive the approval of at least seven members of the board of directors, voting by ballot. Members and directors of such corporations, in acting upon applications for membership, are necessarily entitled to a freedom which is not subject to judicial compulsion. No two members can be compelled to indorse an application, nor can any seven members of the board of directors be compelled to vote in its favor, but both are entitled to act upon their own judgment and according to their own choice. In other words, a court of chancery will not undertake to force upon a corporation of this character, a member, against the will of those whose duty it is to pass upon applications for membership.

The complainant then not being a member of said Ex-·change, nor entitled, either directly or indirectly, to any of. the rights arising from membership therein, the question is presented whether it can complain of any of the rules adopted by the Exchange for the government of the conduct of its own members, or invoke the aid of a court of equity to restrain their enforcement.

The complainant is a joint-stock corporation, organized May 3, 1889, under the laws of this State, with a capital stock of $100,000, divided into shares of $100 each, the sharehold-. ers consisting principally if not exclusively of persons and firms engaged in the business of shipping live-stock to the Union Stock Yards at Chicago for sale. The principal office of said corporation is located at the stock-yards, and the objects for which said corporation was formed, as declared by its articles of incorporation, are as follows:

"To engage in the business of buying, selling and handling live-stock upon commission at the Union Stock Yards, State of Illinois, and at such other points throughout the United States as may be deemed advisable, and also to encourage the stockholders of said corporation to raise, improve, feed and ship to market, live-stock; and in order to better effectuate said latter object, it is hereby expressly stipulated and agreed by and between the parties hereto, that the net earnings of said corporation shall be distributed among the stockholders thereof annually in the following manner, to-wit: Sixty-five per cent of said net earnings shall be distributed to said stockholders in the ratio of the number of stock shipped by each stockholder to the said corporation for sale during the current year for which said dividend shall be declared, and the remaining thirty-five per cent of said net earnings shall be distributed to the shareholders in said corporation in the ratio of the amount owned by each shareholder in said corporation. It is hereby further expressly agreed and stipulated that no one person shall have the right to subscribe for or own more

than twenty-five shares of stock in said corporation at any time during the existence of said proposed corporation."

Said corporation, on being organized, appointed Rogers as its manager, and he applied for admission as a member of the Exchange and was admitted a member thereof, his initiation fee being paid by the presentation of an outstanding certificate of membership which had been purchased with the money of the complainant. The evidence shows, and upon this point there seems to be no dispute, that when Rogers applied for membership, no disclosure was made by him as to the plan upon which the complainant corporation was organized, and particularly the obligation which it assumed by its articles of incorporation, to distribute annually among its shareholders sixty-five per cent of its net earnings, in the proportion of the number of live-stock shipped by each to said corporation for sale. Rogers was admitted to membership upon investigation by the Exchange of his own personal character and credit, and in ignorance of this peculiar feature of the scheme upon which the corporation represented by him was organized.

The complainant thereupon embarked in the business of receiving consignments of live-stock, both from its shareholders and others, and in selling the same on commission at the stock-yards, the rates of commission charged by it in all cases being in conformity to the schedule of rates established by the Exchange. Said business was managed by Rogers, who, being a member of the Exchange, was enabled to avail himself, in the management of said business, of all the privileges which such membership afforded.

In November, 1889, the complainant having realized a considerable sum of money as the net profits of its business up to that time, distributed such net profits to its shareholders as required by its articles of incorporation, and the Exchange being informed of such distribution, and regarding it as a virtual evasion of its rules establishing minimum rates of commissions, instituted proceedings against the complainant and

its manager for a violation of its rules. Rogers set up, in defense of these charges, in substance, that the complainant was not a member of the Exchange nor subject to its jurisdiction; that so far as his action as a member of the Exchange was concerned, he had strictly conformed to said rules by charging and collecting the rates of commissions thereby established, and having collected them, he had accounted for and paid the same over to his principal, the complainant, as it was his legal duty to do, and that he had no responsibility for the disposition which the complainant had subsequently seen fit to make of the same. These suggestions seem to have been acquiesced in by the Exchange, as the proceedings against both the complainant and its manager appear to have been thereupon abandoned.

The Exchange, however, for the purpose, as may well be presumed, of protecting itself against similar evasions of its rules in the future, amended its eighth rule so as to provide, in substance, that no person should be received for membership in the Exchange, who, in any manner acts for or represents any other live-stock corporation whose charter, regulations, rules or by-laws provide for discrimination in rates or charges for commissions between stockholders and other patrons or customers, whether under the guise of dividends, drawbacks or any other scheme or device whatever, and that no member of the Exchange should act, as agent or otherwise, for any live-stock corporation, whose charter, regulations, rules or by-laws provide for such discrimination, and subjecting a member thus offending to suspension or expulsion. At the same time rule 9 was so amended as to prohibit all members of the Exchange from buying any live-stock, or causing the same to be bought, at the stock-yards from any corporation or live-stock company which is or may be regularly selling live-stock for non-residents on commission, unless some one or more of the stockholders of such company are members of the Exchange in good standing.

It must be admitted that these amended rules, if enforced by the Exchange and obeyed by its members, will have the effect of debarring the complainant, so long as it adheres to its present policy of distributing its net earnings among its shareholders, from becoming, either by itself or its officer or agent, a member of the Exchange, or entitled to the privileges of membership, and also that the members of the Exchange will refuse to purchase of it or its agents any of the live-stock consigned to it for sale at said stock-yards. The question then is, whether these facts are sufficient to entitle the complainant to a decree declaring the invalidity or illegality of these rules, and to an injunction restraining their enforcement.

A voluntary association, whether incorporated or not, has, within certain well defined limits, power to make and enforce by-laws for the government of its members. Such by-laws are ordinarily matters between the association and its members alone, and with which strangers have no concern. If the association, or a majority of its members, pass by-laws which are unreasonable, or contrary to law or public policy, and attempt to enforce them as against a dissenting or unwilling minority, such minority may undoubtedly, in proper cases, appeal to the courts for relief against their enforcement. But mere strangers have ordinarily no right to interfere. As to them, such by-laws are matters of no concern. They do not apply to and are not binding upon them.

In the present case, no member of the Exchange is making any complaint of these by-laws, nor is there any suggestion, either in the pleadings or proofs, that these by-laws have been passed, or are likely to be enforced, against the objection of a minority of the members, or against the objection of any one member, of the Exchange. So far then as this proceeding is concerned, it must be assumed that they were adopted with the assent and concurrence of all the members, and are therefore satisfactory to all alike. They are therefore

to be regarded as analogous to or in the nature of a unaimous compact or agreement among the members of the Exchange, not to buy live-stock of corporations engaged in selling the same on commission, unless one or more of the shareholders thereof are members of the Exchange, and excluding from membership the representatives of the complainant, so long as it persists in its present policy of practically cutting rates of commissions by distributing back a portion of its net earnings to shippers. Or, more specifically stated, said by-laws may be viewed as in the nature of a unanimous compact among the members of the Exchange not to deal with the complainant or its agents, so long as it persists in its said policy.

Two questions arise, 1, whether such compact or agreement is illegal or contrary to public policy, and, 2, if it is so, whether a court of equity will interpose in behalf of the complainant and set it aside and enjoin its performance. Admitting the right of the complainant to embark in and prosecute the business for which it was organized freely and without improper obstruction, it does not follow that it has a right to deal with parties who are unwilling to so deal, or to compel those who do not choose to do so to purchase its property. Absolute freedom of commercial intercourse to which a party may be entitled is not interfered with by the refusal of another to deal with such party on any terms. The refusal of any or all of the members of the Exchange to purchase live-stock of the complainant is merely an exercise of their clear legal prerogative, and if they have a right to so refuse, it is difficult to see how an agreement, as between themselves, to abstain from dealing with the complainant, is a matter in respect to which the complainant is entitled to any species of equitable relief.

If it be admitted that said by-laws are so far in restraint of trade as to be invalid for that reason, we are unable to see that the position of the complainant is in any respect improved.

By-laws or contracts in restraint of trade are illegal only in the sense that the law will not enforce them. They are simply void. The law does not prohibit the making of contracts in restraint of trade; it merely declines, after they have been made, to recognize their validity. *Mogul Steamboat Co.* v. *McGregor*, L. R. 23 Queen's Bench, Div. 598, 619. A party to such contract is not bound to perform it, but he may perform it if he sees fit, and his doing so exposes him to no legal animadversion. If the by-laws in question are invalid because of being in improper restraint of trade, they are merely void, and the members of the Exchange, being under no obligation to obey them, may, perhaps, be entitled, at their own instance, to protection against such disciplinary consequences as the Exchange may see fit to impose in case of disobedience. But such protection can not be invoked in their behalf by a stranger, nor can they be required to disobey such rules except at their own volition. There is no suggestion in the record that they are seeking to disobey said rules or desire to do so. The evidence fails to show that the Exchange has taken or contemplates taking any steps for the enforcement of said rules, or that it will have any occasion so to do. These rules having been adopted, presumably, with the approval of the members of the Exchange, there is no reason to suppose that they will not be voluntarily obeyed, and such voluntary obedience is a matter which the courts have no power to restrain.

But the position is taken on behalf of the complainant and most strenuously insisted upon, that the live-stock market at the Union Stock Yards, by reason of its magnitude and its far-reaching influence upon the commerce of the country, has become a public market and therefore impressed with a public use, and that not only said market, but all those doing business therein, are brought within the influence of those rules of public policy which apply to and govern public employments, and which it is the business of the courts to administer and

enforce. After giving this contention our patient considera-
tion, we are unable to yield to it our assent. The market it-
self is established and owned by the Union Stock Yards and
Transit Company, a private corporation, not itself engaged in
the business of buying and selling live-stock, but which pro-
vides the ground, and has established very extensive stock-
yards, to which live-stock shipped to Chicago for sale may be
consigned, and where buyers and sellers may meet, either in
person or by their agents, and transact the business of buying
and selling such live-stock. The bill alleges, and the truth of
the allegation is not questioned, that the amount of business
annually transacted at said stock-yards is such as to consti-
tute the market thus established, the largest live-stock market
in the world.

If it be admitted that the magnitude of the business trans-
acted at said market and its influence upon the general com-
merce of the country are of themselves sufficient to constitute
the stock-yards a public market, so as to impress upon it a
public use, it would probably follow that certain public duties
and obligations would thereby be imposed upon the Stock
Yards Company. It would doubtless be held bound to keep
its market open alike to all who might desire to do business
therein, and perhaps, to make no discrimination between in-
dividuals. But it does not follow that dealers resorting to
said market for purposes of trade would be subjected to simi-
lar rules of public policy. They would deal with each other
merely upon the footing of private parties, owing each other
no duties except those which the rules of honesty and fair
dealings impose. Each would be at liberty to deal or decline
to deal with others precisely as he might see fit. The rules of
trade would be no different from what they are in other mar-
kets, whether public or private.

Nor can it be seen how combinations between merchants
doing business in such public market, either with a view of
increasing or diminishing competition, or of enhancing or

diminishing prices, would be subjected to any rules different from those which apply to such combinations wherever made. As individual merchants, they would be subjected, in their dealings with each other, to no peculiar rules of public policy growing out of the fact that such dealings were in a public market, and an agreement among any number of them not to deal with a particular person or class of persons would not of itself subject them to such rules, but they would be amenable only to those general rules of law applicable to that sort of agreements.

But we are not prepared to hold that the mere fact that the business of a particular market has become very large, gives to the courts any power to declare such markets public and impressed with a public use, or to apply to them any rules of public policy peculiar to that class of markets.

It may well be doubted whether the term, "public market," in the sense in which it is sought to be used here, is one which is known to our law. Markets overt, such as exist in England, are unknown here, nor is it usual in this country to grant to private parties the franchise or liberty of keeping or holding a fair or market, as is done in England. 2 Black. Com. 37. Our statute in relation to the incorporation of cities and villages authorizes the legislative authorities of such municipal corporations to establish markets and market-houses, and to provide for the regulation and use thereof. 1 Starr & Curtis' Stat. 469. And it has been held that the power given to a municipal corporation to establish and regulate markets, includes power to purchase a site, erect buildings, and provide rules for governing the same. *Caldwell* v. *City of Alton*, 33 Ill. 416. But we are not aware that any class of markets in this country, not established by municipal authority, or by virtue of a market franchise granted by the State, has been held, merely because of the magnitude of the business carried on therein, to be impressed with a public use, so as to be held by the courts to be public markets in that sense.

It is not claimed that the keeping or doing business in a market of this character is one of the employments which the common law declares to be public, nor is it pretended that it has been made so by statute. Ordinarily the adoption of new rules of public policy, or the application of existing rules to new subjects, is for the Legislature and not for the courts. Accordingly it may be held to be a general, though perhaps not an invariable rule, that the question whether a particular business which has hitherto been deemed to be private, is public and impressed with a public use, is for the Legislature. The doctrine on this subject is stated in *Ladd* v. *Southern Cotton Press Manufacturing Co.* 53 Texas, 172, where a question very similar to the one under discussion was before the court, as follows: "We know of no authority, and none has been shown us, for saying that a business strictly *juris privati* will become *juris publici*, merely by reason of its extent. If the magnitude of a particular business is such, and the persons affected by it are so numerous, that the interests of society demand that the rules and principles applicable to public employments should be applied to it, this would have to be done by the Legislature, (if not restrained from doing so by the Constitution), before a demand for such use could be enforced by the courts." The view thus expressed would seem to be precisely applicable to the present case, and we are inclined to adopt it as a correct statement of the law as it should be applied to the facts before us. We do not say that there may not be exceptions to the rule thus stated, but if there are they are not of such character as to be material here.

Apart from the consideration that the extension and application of even existing rules of law to subjects not heretofore within their purview is legislative in its nature, the determination by the courts as to the precise point at which a mere private business reaches that stage of growth and expansion which is sufficient to render it *juris publici*, would be surrounded with very great difficulties, and would present ques-

tions for which the courts, unaided by legislation, would be able to find no just or satisfactory criterion or test. But when the Legislature, acting upon a competent state of facts, has interposed and declared the business to be *juris publici*, all difficulty is removed.

The views here expressed do not conflict with what was decided in *Munn* v. *Illinois*, 94 U. S. 113. The question raised and decided in that case was as to the constitutionality of the act of the Legislature of this State, declaring certain grain elevators to be public warehouses, and prescribing rules for their management, and fixing maximum charges for the storage and handling of grain. There the legislative department had interposed and declared the public use, and the court, in holding the act constitutional, held merely that the legislative power had been properly exercised. This was the only question, having any relevancy here, presented in that case or which the court undertook to decide, and the discussion of the evidence showing that the business carried on in said grain elevators was of such character that it had in fact become impressed with a public use, was only for the purpose of showing that a condition of things existed which justified the legislature in passing the statute then under consideration.

The case of *Stock Exchange* v. *Board of Trade*, 127 Ill. 153, is clearly distinguishable from the one now before us. There the Board of Trade had for a series of years, voluntarily engaged in the business of compiling market quotations, showing the fluctuations of the prices of commodities bought and sold on the Board, and of furnishing the same, for a consideration, by telegraph, to all members of the public who desired to obtain them. By this means, the business of buying and selling agricultural products throughout the entire country had been brought under the control of the market prices fixed and determined on said Board. It was held that these quotations were property, and that the Board, by its own act, had so far impressed upon them a public interest, that it should

be required, so long as it compiled and furnished them to any one, to furnish them to all without discrimination. This conclusion was reached upon the theory that the Board had, for a series of years, voluntarily and intentionally, devoted its property to a use in which the public had an interest, and had, in effect, granted to the public an interest in that use, and that it must therefore, so far as it dealt in that species of property at all, submit to be controlled by the public for the common good, to the extent of the interest it had thus created.

The determining elements present in that case are wanting here. The business which is here sought to be subjected to a public use was, at its commencement, confessedly private and private only, and the public use is sought to be impressed upon it, not by virtue of any voluntary grant to the public, but simply because, by mere process of growth and expansion, the business has reached such magnitude as to affect public interests because of its magnitude alone. These facts would doubtless be sufficient to warrant the Legislature, in the exercise of its legislative discretion, in declaring a public use, and placing said business under legal control and supervision, but such power, in our opinion, does not rest with the courts.

The point is made that it was error for the court on sustaining the defendant's motion to dissolve the injunction, to also enter a decree dismissing the bill for want of equity, the contention being, that the bill should have been retained for final hearing on pleadings and proofs, according to the usual practice in chancery. We are of the opinion that the bill was properly dismissed. It was, in substance, at least as against the Exchange, a bill for an injunction only. Its prayer, as against Rogers, having been granted by a prior decree, that portion of the relief sought is not to be considered, and as against the Exchange, nothing is prayed for but an injunction, except that the Exchange be required to issue the certificate of membership formerly held by Rogers to the complainant. Under no possible view of the case, even if the bill had been

retained for a further hearing, could this latter relief have been granted. The dissolution of the injunction was, in effect, a disposition of the entire case. Besides the bill, upon its face, as we think sufficiently appears from what has been said, is without merit, and when that is the case, a motion to dissolve an injunction, the bill being in effect for an injunction only, has the same effect as a demurrer to the bill, and the court, on sustaining such motion, may properly dismiss the bill. *Titus* v. *Mabee,* 25 Ill. 257; *Weaver* v. *Poyer,* 70 id. 567; *Prout* v. *Lomer,* 79 id. 331.

What we have said renders it unnecessary for us to consider the effect upon the status of the complainant of the fact, about which there seems to be no dispute, of its failure to record its certificate of incorporation, until after the commencement of the present suit.

It is contended that the decree in favor of the defendant corporation awarding damages on dissolution of the injunction is not sustained by the evidence, and is therefore erroneous. We have duly considered the evidence applicable to that question, and are of the opinion that it supports the decree. The only damages proved are for solicitors' and counsel fees incurred in obtaining a dissolution of the injunction. It appears to us to be a fair conclusion from all the evidence that the sum awarded, viz., $1250, is no more than is fairly chargeable for the services rendered by solicitors and counsel in the mere matter of obtaining a dissolution of the injunction.

We find no material error in the record, and the judgment of the Appellate Court will be affirmed.

*Judgment affirmed.*

Mr. JUSTICE MAGRUDER: I do not concur in this decision.