THE STATE ex rel. THE STAR PUBLISHING COMPANY v. THE ASSOCIATED PRESS.

In Banc, January 25, 1901.

1. **Mandamus: DEMAND NECESSARY.** A prior express and specific demand by relator of what he seeks, and a refusal by respondent, are indispensable to granting the writ of mandamus.

2. ———: TO COMPEL DEFENDANT TO CONTRACT. The writ of mandamus will not be issued to compel a party to enter into a contract; especially where the contract sought is for a daily news service to be rendered by a news gathering association to a publishing company, as the performance of such a contract necessarily involves and requires for a long time the exercise of judgment, continuous supervision, special experience and business discretion.

State ex rel. v. Associated Press.

3. ———: ASSOCIATED PRESS: ADMISSION. A by-law of the Associated Press authorizing the admission of certain parties by vote of the directors, without the consent of local members, does not entitle such parties to admission without the sanction of the board.

4. Corporation: SURRENDER OF POWERS. Although the respondent by its original charter was authorized to conduct a telegraph and telephone business and to exercise the right of eminent domain, it could by amendment of its charter eliminate and abdicate those powers.

5. Person: GOVERNMENTAL CONTROL OVER: WHEN EXERCISED. A person can be brought under governmental control in relation to his property or business only in virtue of the police power, the exercise of the power being based on a dedication of the property to public use, or where the business is *quasi* public, or the enjoyment of some privilege or immunity incident to such business. (Munn's case, 94 U. S. 113, criticised.)

6. Corporation: MONOPOLY: ASSOCIATED PRESS. The respondent in the exercise of its business of gathering and distributing news has no monopoly, and has been granted no special or exclusive rights or privileges by the State. Its news reports are private property and its right to contract with reference to them can not be interfered with.

7. ———: ———: ———: NEWS-GATHERING: OCCUPATION. The business of news-gathering is one of mere personal service, an occupation. There is involved in it no property to be "affected with a public interest," and no basis shown for the fact or charge of monopoly.

8. ———: ———: ———: ———: DISCRETIONARY WRIT. The evidence shows the existence of news-gathering agencies other than the respondent, and also that many newspapers throughout the country are successfully conducted without the aid of its service. As the petitioner upon its own showing is receiving a news service better than that of its rivals, the court will not issue a discretionary writ for the mere purpose of determining an empty and barren technical right in its favor.

9. ———: ———: ———: ———: PUBLIC USE: POLICE POWER: COURTS. The Legislature may in the proper exercise of the police power declare that a business has become impressed with a public use; the courts are powerless to do this.

10. ———: ———: LAWS OF OTHER STATES. The anti-trust laws of Illinois are not of force in this State. Those of the United States must be enforced in another forum. Those of Missouri are not applicable to respondent's business.

## *Mandamus.*

PEREMPTORY WRIT DENIED.

*Seymour D. Thompson, William J. Stone* and *Nathan Frank* for relator.

(1) The business of collecting, distributing and vending news to a great number of newspapers throughout the United States is, under the principles of the common law, and wholly without reference to the circumstances of the defendant, being a corporation and the grantee of important franchises, including the delegated right of eminent domain—a business affected with a public interest, which therefore is not *juris privati* and in respect to which the defendant is bound to serve all members of the public applying for its news service equally, under equal conditions. Lord Hale's Treatise De Portibus Maris, Ch. 6; 1 Harg. L. Tr., p. 77; Allnutt v. Inglis, 12 East. 527. The crucial question in the case at bar is whether the employment of the defendant is analogous to that of a common carrier of news, or to that of a private carrier of news. If it were an open question, it would seem that the principles of the common law could leave no room for doubt that it belongs to the former class; but, as we shall show hereafter, the question is concluded by authority. On this principle of the common law, the right of the State to regulate the charges of grain elevators in Chicago was based in the great case of Munn v. Illinois, 94 U. S. 118; and the doctrine in this last case was applied by the same court to the proprietor of a grain elevator

who was not incorporated.    Budd v. New York, 143 U. S. 517.    (2)    Where a person or corporation is engaged in an employment affected with a public right or interest and also has a monopoly of that employment, the public nature of the employment conjoined with the fact of the monopoly compels such person or corporation to serve the public equally and for a reasonable compensation; and, for the purposes of this rule, it makes no difference how the monopoly was acquired.    Lord Hale's Treatise, De Portibus Maris, Ch. 6; 1 Harg. L. Tr., p. 77; Bolt v. Stennett, 8 Term Rep. 606; Anonymous, 8 Term Rep. 608, note; Allnutt v. Inglis, 12 East. 527.    (3)    The power conferred upon an incorporated company or association to perform, for private gain or advantage, duties affected with a public interest, compels the performance of these duties without partiality or discrimination, and renders all engagements not so to perform them void.    This principle has been applied in the case of railroad companies in frequent instances in England and in this country, and generally without the aid of any express statute commanding the performance of the particular duty in favor of the party complaining.    Messenger v. Railroad, 36 N. J. L. 407; State v. Railroad, 17 Neb. 659; Marriott v. Railroad, 1 Com. B. (N. S.), 499; Garton v. Railroad, 30 L. J. (Q. B.), 273; Sandford v. Railroad, 24 Pa. St. 383; Vincent v. Railroad, 49 Ill. 33; Atwater v. Railroad, 48 N. J. L. 55; People v. Railroad, 130 Ill. 175; Railroad Commissioners v. Railroad, 63 Me. 269.    The governing principles of these and other like cases hereafter referred to is, that where a corporation undertakes to perform a service to individual members of the public distributively, whether such undertaking is assumed by accepting a charter which commands the performance of the service in express terms, or which merely permits or licenses its performance, from which permission or license an obligation to perform it

is implied in law, such corporation can be compelled by suitable legal process—generally a mandamus, sometimes a mandatory injunction—to perform that service.    Haugen v. Light Co., 21 Ore. 423; Vincent v. Railroad, 49 Ill. 33; Atwater v. Railroad, 48 N. J. L. 56; State v. New Haven Co., 37 Conn. 153; State v. Nebraska Tel. Co., 17 Neb. 126; State v. Railroad, 17 Neb. 647; Waterworks v. State, 46 Neb. 194, s. c., 30 L. R. A. 447.    (4)    This doctrine is especially applicable to "common carriers of news."    The attention of the court is now asked to a class of the foregoing cases where this doctrine has been asserted against corporations engaged in a certain kind of business which the courts have designated as that of "common carriers of news."    These are telegraph companies furnishing business houses with market reports under continuing contracts and delivering such reports in such business houses by means of a telegraphic instrument called a "ticker." Friedman v. Tel. Co., 32 Hun (N. Y.) 4; Smith v. Tel. Co., 42 Hun (N. Y.) 454.    (5)    The defendant is subject to the operation of this principle because it is a telegraph and telephone company and, as such, has the delegated power of eminent domain.    It is by accepting this franchise, with liberty to exercise it at pleasure, that the corporation is deemed to undertake to serve the public equally.    Haugen v. Light Co., 21 Ore. 411.    (6)    The defendant is obliged to serve its news reports to publishers equally under equal conditions, because the statute law prohibits it from doing otherwise.    Craft v. McConoughy, 79 Ill. 346; Coal Co. v. Coal Co., 68 Pa. St. 173; Horner v. Graves, 7 Bing. 743.    (7)    A survey of the preceding cases will show that mandamus has been the remedy usually resorted to at the relation of private persons or corporations, discriminated against by persons or corporations engaged in the performance of public duties, to compel such persons or corporations to serve the relators equally with other

persons or corporations under like conditions; though mandatory injunctions have been used in a limited number of cases. We refer to the following, among many other cases, as illustrations of the proposition that the writ of mandamus is the proper remedy here.   State v. Railroad, 17 Neb. 647; Railroad v. People, 56 Ill. 365; Atwater v. Railroad, 48 N. J. L. 55; People v. Railroad, 130 Ill. 175; Potwin Place v. Railroad, 51 Kan. 609; s. c., 37 Am. St. Rep. 312; Haugen v. Light Co., 21 Ore. 411; State v. Nebraska Tel. Co., 17 Neb. 126; Waterworks Co. v. State, 46 Neb. 194; s. c., 30 L. R. A. 447; Railroad v. Hall, 91 U. S. 343; affirming s. c., 3 Dill. (U. S.) 515; People v. Gaslight Co., 45 Barb. (N. Y.) 136; Price v. Riverside Co., 56 Cal. 431; Wheeler v. Irrigation Co., 10 Colo. 582; State v. Joplin Waterworks, 52 Mo. App. 312; Central Union Tel. Co. v. State, 118 Ind. 194; Central Union Tel. Co. v. State, 123 Ind. 113; Central Union Tel. Co. v. Bradbury, 106 Ind. 1; Bell Tel. Co. v. Com. (Pa.), 3 Atl. Rep. 825; State v. Tel. Co., 36 Oh. St. 296; State v. Bell Tel. Co., 23 Fed. Rep. 539; State v. Delaware, etc., Tel. Co., 47 Fed. Rep. 683; State v. Bell Tel. Co., 44 Am. Rep. 241; s. c., 22 Albany L. J. 363; Chesapeake, etc., Tel. Co. v. Baltimore, etc., Tel. Co., 66 Md. 399; People v. Railroad, 130 Ill. 175; State v. Railroad, 17 Neb. 647; State v. Nebraska Tel. Co., 17 Neb. 126; In re Trenton Water Power Co., 20 N. J. L. 659; Uniontown v. Commonwealth, 34 Pa. St. 293.

*Boyle Priest & Lehmann* and *R. E. Ball* for respondent; *F. N. Judson* of counsel.

(1)   By-law seven was not enacted for the benefit of the relator, and it does not in any view create a contract between the relator and respondent.   The courts will not by mandamus

compel the making of a contract, nor will they by mandamus or otherwise specifically enforce a contract whose performance requires long time, continuous supervision, special experience and business discretion.     14 Am. and Eng. Ency. of Law, 104; Tapping on Mandamus, 65; State ex rel. Bohannon v. Howard Co., 39 Mo. 375; Iron Age Co. v. Western Union, 83 Ala. 498; People v. Dulaney, 96 Ill. 503.     (2)     If news-gathering is a public employment, then, *a fortiori* the publi-cation of a newspaper is so.     The entire usage of English-speaking peoples with newspapers has been with them as in-stitutions which should be free.     In the gathering and trans-mission of its news, the Associated Press exercises no public franchises whatever.     The gathering of news is a personal service, and the transmission of it is through public instrumen-talities, with respect to which the Associated Press neither has nor claims any peculiar rights or privileges.     The report of current events made by the members of the Associated Press and by its employees, being the product of individual labor unaided by public powers or special privileges, is private property.     Venable v. Wabash, 112 Mo. 103; Harding v. Goodlett, 24 Am. Dec. 546; News Co. v. Stone, 15 N. Y. Supp. 2; Matthews v. Associated Press, ibid. 887.     (3)     The charter of the Associated Press does not assume to impose upon it any duty to render service to the relator.     Nor would such obligation, if it existed, be enforced in this State.     (4)     The Associated Press is but an association of publishers who have combined their efforts and facilities to gather news for them-selves as efficiently and economically as possible.     It has and can have no monopoly of the news itself, and has neither mo-nopoly nor special facility for the transmission of news.     Other agencies for news-gathering do in fact exist and are in suc-cessful operation at this time.     In direct contradiction of the allegations of the petition for mandamus the publishers of the

Star assert that they now enjoy a better service than that rendered by the Associated Press. Commonwealth v. Hunt, 4 Metc. (Mass.) 111; Cote v. Murphy, 8 Am. R. R. and Corp. Rep. 610; Shoe Co. v. Saxey, 131 Mo. 212; Arthur v. Oakes, 63 Fed. Rep. 31; United States v. Debs, 64 id. 724; Case of Phelan, 62 id. 803; United States v. Elliott, 64 id. 27; Herriman v. Menzies, 46 Pac. Rep. 730; Matthews v. Associated Press, 32 N. E. 981; Munn v. Illinois, 94 U. S. 113; 18 Am. and Eng. Ency. of Law, 746; Tiedeman, Limitations of Police Power, sec. 2. (5) The Associated Press, while authorized by its original charter to conduct a telegraph and telephone business, never in fact exercised such authority, and therefore had not the right of eminent domain. Since this suit was begun it has amended its charter and relinquished all right to do a telegraph or telephone business. Harding v. Goodlett, 24 Am. Dec. 546; People v. Railroad, 53 Cal. 694; Sholl v. Coal Co., 118 Ill. 427; Louisville Co. v. Dist. Tel. Co., 8 Am. R. R. Corp. 650. (6) The purpose of the Associated Press is simply to facilitate and cheapen the gathering of news by its members. It does not assume to regulate in anywise the dealings of its members with the public, and does not in any manner restrict or hinder competition between them. Vawter v. Railroad, 84 Mo. 679; Shoe Co. v. Saxey, 131 Mo. 212; Hopkins v. United States, 19 Sup. Ct. Rep. 40; Anderson v. United States, 19 Sup. Ct. Rep. 50. (7) The business of the Associated Press is the rendition of personal service; but if it is to be considered as commerce, it is interstate and international, and therefore within the exclusive power of Congress to regulate. The inaction of Congress respecting any branch of commerce is tantamount to a declaration that such commerce shall be free. If the anti-trust statute of the United States is held to be applicable, then the remedies prescribed by it are exclusive of all others. Welton

v. Missouri, 91 U. S. 275; County of Mobile v. Kimball, 102
U. S. 691; Railroad v. People, 119 U. S. 557; Western Union
v. Pendleton, 122 U. S. 347; Beach on Monopolies, 713;
Grccr v. Stoller, 77 Fed. Rep. 1; Blindell v. Hogan, 54 ibid.
41; Ridock v. Harrington, 64 ibid. 821.    (8)    The four-
tcenth article of amendment to the Constitution of the United
States created a national citizenship independent of the citi-
zenship of any particular State.    The citizens of the United
States have a paramount right to communicate with each other
by all the modes known to modern civilization, with respect to
any and all matters of common interest.    Crandall v. Nevada,
6 Wall. 35.

SHERWOOD, J.—The object of this original proceed-
ing is to compel respondent, the Associated Press, to furnish
to the Star Publishing Company for publication in its news-
paper, "The Star," the budget of news collected daily by re-
spondent, and also its Saturday night news reports.

Relator avers tender of a sum above that for which other
papers of St. Louis are served by respondent with such news,
and also avers demand made on respondent for furnishing to
it its Sunday morning reports as per contract, and for such
daily news reports, and its refusal to furnish the same.

Relator also alleges: "That the relator herein now is
and has been for a long time past, to-wit, for the period of six
months, ready and willing to enter into a proper contract with
the said Associated Press to receive and pay the reasonable
charges of the said Associated Press, not only for its Saturday
night news reports, but also for its daily news reports, and to
comply with all the terms and conditions which the said As-
sociated Press imposes upon its other publishers of daily Eng-
lish newspapers in the city of St. Louis receiving such news re-
ports."

But there is no averment that relator demanded of respondent to enter with it into such "proper contract," nor that respondent refused to enter into such a contract, nor in what such a contract would consist, although the mandate of the alternative writ commands, "that you do serve this relator, the Sayings Company, at the city of St. Louis, State of Missouri, with your regular afternoon news reports, and with your regular Saturday night news reports, the same being the reports which you serve at said city to the Pulitzer Publishing Company under your subsisting contract with the said company, upon the payment to you by said relator of the same just and reasonable charges for said news reports which you receive from said Pulitzer Publishing Company, and upon compliance with such reasonable agreement in that behalf as you shall make with this relator, and with such reasonable by-laws, rules and regulations as you have made or shall have made in that behalf, and that you continue so to furnish this relator with your said daily afternoon news reports and your said Saturday night news reports so long as this relator shall comply with the contract made between you and it in that behalf."

The substance of the issues presented by the pleadings of the parties to this litigation has been very well condensed by counsel for respondent, and we adopt such condensation.

Relator asserts:

1. That it has a contract with the Associated Press for the Sunday morning news.

2. That the gathering of general news for publication in a daily newspaper is a public employment which must be exercised by those who engage in it for all publishers of dailies who may desire it, upon equal terms and without discrimination.

3. That the Associated Press has by its charter assumed this public employment, and so is bound to exercise it on behalf

of the relator, upon tender of compensation equal to that paid by other publishers similarly situated and receiving a similar service.

4.    That the Associated Press has broken down all competitors and secured a monopoly of the business of news-gathering, in consequence of which it is not practicable to publish a daily newspaper without the aid of its service.

5.    That the Associated Press has been granted telegraph and telephone franchises by the States of Illinois and Missouri, and also possesses the power of eminent domain.

6.    That the by-law of the Associated Press which makes the consent of existing members a condition of admitting new members in any locality is in violation of the anti-trust laws of Missouri, Illinois and the United States.

The respondent, on the other hand, asserts:

1.    That it never made any contract with the relator.

2.    That the gathering of news, whether for daily newspapers or for other publications, is a purely private business requiring for its conduct no public franchises or privileges.

3.    That while the Associated Press is in form a corporation for pecuniary profit, in its substance it is but a voluntary association of publishers of newspapers who have combined their energies for the sake of greater efficiency and economy in news-gathering.

4.    That it has not and can not possibly monopolize the business of news-gathering, and that in fact there are now other general news-gathering agencies in successful operation in the United States.

5.    That it does not own or operate telegraph or telephone lines and has no means for the transmission of news except such as are open to everybody on like terms.

6.    That it has never exercised and does not possess the power of eminent domain.

7. That it is not a trust in any sense, nor is there anything unlawful in its methods or aims, since the combination which it accomplishes among its members has exclusive reference to a matter of internal economy and leaves the members unaffected and unrestrained in so far as concerns their relations to the general public.

8. That its business is national and international in its scope and character, and so is protected against State interference by various provisions of the Federal Constitution which are cited.

I. It is fundamental in the law of mandamus, that it is indispensable to granting the writ, that a prior express and specific demand be made of respondent of that which relator seeks, and that a refusal of such demand occur before relator has any standing in court, or his application for the writ contains any ground for relief (Tapping on Mand., 282; 2 Spelling Extr. Rel., sec. 1381); and it should also be shown that defendant has it in his power to perform the act. [Moses on Mand., 204; High Extr. Leg. Rem. (3 Ed.), sec. 13; 14 Am. and Eng. Ency. of Law (1 Ed.), 106.]

Mandamus is never granted in *anticipated* omission of a duty. An actual omission of duty must have occurred before application for the writ is made. [High Extr. Leg. Rem. (3 Ed.), sec. 12.] Here there is no averment that relator even attempted to enter into "a proper contract" with respondent, saying nothing as to what those words mean.

Not only must the petition for the alternative writ contain such specific allegations as to prior demand, met by a refusal, but the judgment, if for relator, must be equally specific both as to the rights of the plaintiff and the obligation imposed on the defendant. [Price v. Riverside, etc., 56 Cal. 431.] If the petition for the writ be defective as aforesaid, the defect is a fatal one. [Ib.]

If defendant is not in default about agreeing to make an undefined contract with plaintiff, then this court has no basis on which it can act, and therefore can enter no valid judgment on this point.   [Ib.]

Again, the allegations of a "reasonable agreement" or "proper contract" in the alternative writ are too vague and indefinite to base the judgment of a court upon.   What is a "proper contract?" or what a "reasonable agreement?"

II.    But in addition to the points above, courts will not by mandamus compel the making of a contract, because, in such case, the element of the specific act to be performed must be wholly lacking.   [People v. Dulaney, 96 Ill. 503.]   Nor has a court any authority to compel the performance of executory contracts.   [Ib.]   See, also, Railroad v. Railroad, 110 U. S. 667; Express Cases, 117 U. S. 1; Railroad v. Jacobson, 21 Sup. Ct. Rep. 115.

Besides, a contract of the kind in contemplation must necessarily involve and require for a long time the exercise of judgment, continuous supervision, special experience, and business discretion.   [Ib. and 14 Am. and Eng. Ency. of Law, 104; People v. Dulaney, supra; High, Extr. Leg. Rem. (3 Ed.), secs. 25, 28; Iron Age Pub. Co. v. Tel. Co., 83 Ala. 498.]

The case last cited strongly bears on, and affords apt illustration of the principle now under discussion, as well perhaps as others involved in this case.   The Iron Age Company had contracted with the New York Associated Press, whereby it asserted the exclusive right to receive and to publish at Birmingham, Alabama, the daily news reports of the New York association.   The Iron Age Company complained of a breach of this contract for that the Western Union Company gave those reports to two other daily papers in Birmingham.   On this basis of fact, the Iron Age Company prayed injunction

for specific performance. But this relief was denied, the court saying, "We have seen that the duty involves the exercise of special skill, judgment and discretion, being intellectual as well as mechanical in their character. These duties are also continuous in their nature and of indefinite duration," and that the court could not "superintend the continuous performance of these duties."

III. The same line of remark and of authorities would be applicable to by-law 7 had it been enacted for the benefit of relator, which is clearly not the case. Under that by-law relator asserts that it is entitled to the service of news for its Sunday edition under an existing contract with the United Press. But that by-law, which respects the admission of members, only allows the admission of new members upon the affirmative sanction of a majority of the board of directors. This sanction has not been obtained, nor is it asserted that it has. But had the by-law been enacted for relator's express benefit, it lacks a great deal of being a *contract* in its favor. It fixes no compensation to be paid, nor any other terms which go to make up a contract between the respondent and its members. *Price* is as essential as any other of the terms of a contract, and without this agreed upon, no contract exists. [Kelly v. Thuey, 143 Mo. loc. cit. 435.]

And, as before stated, mandamus does not lie to compel parties to contract with one another; it would be wholly foreign to the nature and attributes of such a writ which issues only for the enforcement of a *clear and specific legal right,* which right has been omitted to be granted by one whose duty it was to grant it. Until the party whose duty it was to grant such right makes default, mandamus does not lie.

IV. In so far as relates to respondent being possessed by its original charter of a right to conduct a telegraph and telephone business; it never exercised that authority and therefore

did not require the right of eminent domain; that right lay dormant. But whether exercised or not, the charter having been so altered by amendment as to eliminate those rights, the case stands here as if such rights had never been existent. If, as all the authorities concede, a corporation may abdicate *all* the rights conferred upon it and go out of business altogether, then no difficulty can occur in its abdicating a *portion* of those rights. What is true of the *integer* of rights, must needs also be true of each of its component fractions; the greater includes the less.

V.    These remarks bring up for discussion the main issue in this cause, in which the doctrine announced in the Munn Case, 94 U. S. 113, is relied on by relator. That case has never received the entire sanction of the legal profession, nor indeed the entire concurrence of all the members of the two courts which announced the decision.

Two dissents were entered at the time the majority opinion was delivered, Mr. Justice FIELD writing the minority opinion, marked by his accustomed ability, and concurred in by Mr. Justice STRONG. And there were two dissents also entered in the State Supreme Court (69 Ill. 80).

Since then, there have been various limitations to the doctrine suggested by various judges who concurred in the original opinion and subsequently pointed out what they understood the opinion to mean, and what they meant by their concurrence. And in subsequent cases there have been dissents which have gone in direct opposition to the ruling in that case. Thus, in Budd v. New York, 143 U. S. 517, BREWER, FIELD and BROWN, JJ., dissented, while in Brass v. Stoeser, 153 U. S. 391, BREWER, FIELD, JACKSON and WHITE, JJ., dissented.

Munn's case in brief was this: The Constitution of Illinois adopted in 1870, contained a provision which converted every warehouse in which grain or other property was

stored for a compensation, into a public warehouse.  There-upon, the Legislature of the State of Illinois, in 1871, passed an act concerning warehouses in cites having a population of not less than 100,000 inhabitants.  This act fixed a maximum charge for the storage and handling of grain, and made it a crime to fail to take out license to do business as a public ware-houseman.  Munn & Scott, a private and unincorporated firm, owning a private warehouse and refusing to take out a license, were prosecuted, found guilty and fined, and on appeal taken the judgment was affirmed in the State Supreme Court (69 Ill. 80), and afterwards in the Supreme Court of the United States.  The act in question was held not obnoxious to any provision of the Constitution of the United States, and par-ticularly to the fourteenth amendment to that instrument, pro-viding that no State shall "deprive any person of life, liberty or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws."

The authorities cited in the opinion of the latter court, and we say it with due deference, scarcely warrant the con-clusion reached.  Thus, HALE, as quoted, in his treatise *De Portibus Maris*, says:

"A man for his own private advantage, may, in a port or town, set up a wharf or crane, and may take what rates he and his customers can agree for cranage, wharfage, housellage, pes-age; for he doth no more than is lawful for any man to do, viz., makes the most of his own.  If the king or subject have a public wharf, unto which all persons that come to that port must come and unlade or lade their goods as for the purpose, because they are the wharves only licensed by the king, or because there is no other wharf in that port, as it may fall out where a port is newly erected, in that case there can not be taken arbitrary and excessive duties for cranage, wharfage, pesage, etc.; neither can they be enhanced to an immoderate

rate, but the duties must be reasonable and moderate, though settled by the king's license or charter. For now the wharf and crane and other conveniences are affected with a public interest, and they cease to be *juris privati* only; as if a man set out a street in new building on his own land, it is now no longer bare private interest, but is affected by the public interest."

In the first part of the quotation, distinct and express recognition· is given to the fact that *private* wharfs were in abundant existence in HALE's time and were, if remaining private, unrestricted in their charges. In sharp antithesis to the case of the owner of a *private* wharf, stands that of one, be he king or subject, who has in operation a *public* wharf. The reason of this is that "In England it hath always been holden, that the king is lord of the whole shore" (1 Black, 264), and being thus lord (and as Judge COOLEY suggests) the title to the soil under the navigable water in England being invested in the Crown, therefore, such wharves can only be erected by express or implied license, and by making use of the public property in the soil. In such circumstances, then, the result naturally followed that such wharf was "affected with a public interest," since it was public property, used either directly or indirectly by public permission, and, of course, subject to such terms as the sovereign might impose.

And the same rule would hold where the owner makes a dedication of his otherwise private wharf to the public use. In either case of erection by public permission or as a dedication, compensation for wharfage is limited to reasonable charges. Thus, the wharfinger occupies the same position, precisely, as does one who sets out a street in new building on his own land. [Heitz v. St. Louis, 110 Mo. loc. cit. 625, and cases cited.]

If the first part of the quotation heretofore made does not recognize that there are such things as *private* wharfs uncon-

trolled and uncontrolable in their charges, then the words used by Hale as aforesaid, fail of their purpose and are devoid of meaning.

Allnutt v. Inglis, 12 East 527, decides nothing to the contrary of the doctrine asserted by Hale, for that was a case where the London Dock Company built warehouses in which wines were deposited upon payment of such rent as the warehousemen and the depositors agreed upon. Afterwards, however, the London Dock Company obtained from the government a certificate, whereby, under the general warehousing act, the importers could lawfully lodge and secure their wines, without paying the duties on them in the first instance; and this right was exclusive in the dock company and upon this it was held that in consequence of accepting the benefit arising from the certificate, such a monopoly and public interest attached upon the property of that company, as compelled it to charge only reasonable rates for receiving wines into its warehouses, Lord Ellenborough remarking: "There is no doubt that the general principle is favored, both in law and justice, that every man fix what price he pleases upon his own property, or the use of it; but if, for a particular purpose, the public have a right to resort to his premises and make use of them, and he have a monopoly, he must as an equivalent, perform the duty attached to it on reasonable terms."

In short, it is the privilege conferred either directly or indirectly, or the dedication to the public use, which give origin to the duty toward the public to demand only reasonable compensation for services rendered. And this is all, it would seem, that is meant by Hale when he speaks of "the wharf, crane," etc., being "affected with a public interest."

But for the acceptance of the exclusive-privilege-conferring certificate, there was no question, and there could be none, that the London Dock Company could have continued on the

even tenor of its way making such bargains for rent of its warehouses with its patrons as could be agreed upon, and no extent or magnitude of such business, could have "affected with a public interest" the warehouses of the London Dock Company.

And it is not inappropriate to say just here, that Allnutt v. Inglis, though quoted from on the basis and theory of being parallel to the Munn case, lacks such parallelism in this important and controlling feature and particular, to-wit, that in the former, the London Dock Company, of its own free will, accepted the warehousing act, and having done so, took its burdens along with its benefits, while Munn & Scott were forced by the organic law, and in invitum had their private elevator turned into a public one, without a single benefit received or a single privilege granted. Is it within the bounds or range of possibility for a distinction to be more plainly apparent than between these two cases? Had the all-omnipotent Parliament of England forced the London Dock Company to accept the warehousing act, then this would have brought the Allnutt-Inglis case on the same plane and under the same rule as the Munn case announces, but had Parliament done so, it would have been incontinently regarded as a high-handed invasion of common right.

In the License cases (5 How. U. S. 504), the only point decided was that various regulations for the sale of intoxicating liquors, and requiring licenses to issue, enacted by certain States, were not repugnant to the Federal Constitution. As to the case of Mayor, etc., v. Yuille, 3 Ala. 137, cited and quoted in Munn's case to show that an ordinance regulating the weight and price of bread was valid, it suffices to say that the only point in judgment there was whether that portion of the ordinance was valid which regulated the weight of bread; and it was adjudged valid in that particular. The baker in that case had failed to conform to the ordinance in

regard to the *weight* of his loaves. On this ground *alone* was he prosecuted, to-wit, that he had sold bread of *less weight* than that ordained by the ordinance. There was no question raised, and he raised none in the trial court about the *price* and so the remark made in 3d Ala. was wholly *obiter*. Even a casual reading of that case shows the correctness of this statement. [See Buffalo v. Collins Baking Co., 57 N. Y. Supp. 347; s. c., 53 N. Y. Supp. 968.] Bolt v. Stennett, 8 Term Rep. 606, illustrates the same principle announced in Allnutt v. Inglis, *supra*, for there the crane was set up by its owners on a *public* quay (by an express or implied license of the government) and being so set up, the public had a right to resort there and make use of it in loading and unloading their vessels; and this being the case, compensation for such services could not be demanded beyond a reasonable sum.

In the principal opinion reference is made to the cases of public ferries, innkeepers, common carriers, hackney-coachmen, etc.; but in all these instances, those persons who engaged in such occupations or in building, owning or operating such properties, did so on the grounds and bases of some special privilege granted by the sovereign power, or of some open and unambiguous dedication to the public use, which grant or which dedication took with them the necessity of submission to the terms on which the grant or dedications were made.

Thus, an inn at common law was *publici juris*, and innkeepers compellable, where they had room, to receive all guests and their horses, and every man had a right to put up at such common inns, and they were devoted to the service of the community. [Robinson v. Walter, 3 Bulstr. 269; Rex v. Collins, Palmer 367; s. c., 2 Ro. Rep. 345.]

For this reason, they were granted protection by the law; had a lien on the baggage and horses of their guests; were liable if their guests' goods were stolen, and were liable to suit .

for refusing to receive a guest, he tendering a reasonable price for the same, and also liable to indictment for such refusal. [5 Bac. Ab. Tit. Inns and Innkeepers, 232.]

But although a livery-stable keeper does a very extensive business, yet he enjoys none of the privileges of an innkeeper, and contracts with his patrons on his own terms, and is not bound in law to receive coaches or horses, because he stands on the foot of *private contract* only, and is not under obligation by law to receive the horses, etc., of guests, as are innkeepers. [Francis v. Wyatt, 3 Burr. 1498.]

Thus, ferries were both private and public at common law; the former, where a person conveyed only himself and family across a stream of water; the other, where the owner could only operate it under a license, deemed a franchise, of the king, and where the ferry was treated as part and parcel of the public highway; and for so operating such ferry, the owner was permitted to take such rates of toll as the law allowed. [Mayor v. Starin, 106 N. Y. 1, and cases cited.]

Thus, with respect to mills, the lords of the manor having erected mills on their respective domains for the public advantage, fettered their gift with the condition that those resident within their manors were to grind at their mills and upon this exclusive right to compel the public to grind at their mills, arose the right of the lord of the manor to regulate tolls taken at such public mills. [Woolrych on Waters, chap. 6; Hix v. Gardiner, 2 Bulstr. 195; 15 Viner's Abr., 398, 399; Cooley, Const. Lim. (8 Ed.), 735, 736.]

In this country, mills being at an early day operated by water, they became affected by a public use by reason of the fact that in order to establish them it became necessary to exercise the power of eminent domain in flooding the lands of others, and thus the owner of the mill, having accepted governmental aid in establishing his mill, had to submit to govern-

mental control as to his charges for grinding. And when steam mills came into use, it was an easy transition for the Legislature to regulate their tolls without inquiring the reason or making any distinction between mills of the latter and of the former kind.

The same view holds as to the right to fix the fees of hackmen, exercising, as they do, a public employment in the public streets and engaged in an occupation affording special opportunities for impositions and frauds, and therefore requiring close supervision, they are granted privileges of occupying certain public stands denied to others, and their charges to the public are regulated, which is only a condition imposed in return for privileges granted, privileges otherwise liable to abuse.

And a like rule holds as to a common carrier, one who holds himself out to the public as ready and willing to carry, for hire, certain classes of goods. Doing this, he thereby exercises, so it is said, "a kind of public office," and grants the public such an interest in his business as authorizes each individual to demand the carriage of his goods upon tender of a reasonable, or a legally regulated, compensation. And as a result of his general assumpsit to the public, he is given a lien on the goods of his patrons, both for transportation and for advances made on them to the other carriers, and made responsible for their safe carriage except in certain cases.

Not so, however, with a mere private carrier, and no instance is on record where any legislation, even during the rigors of the common law, or the regime of an all-prevailing parliament has ever been attempted as to the regulation of *his* charges.

Nor can any instance be found where any lodging-house keeper, however extensive his business or numerous his patrons, has ever been deemed to have his "property affected with

a public interest," or had his rates for board supervised or fixed by law. After discussing the cases of the common carrier, innkeeper, etc., the learned Chief Justice says: "Under such circumstances it is difficult to see why, if the common carrier, or the miller, or the ferryman, or the innkeeper, or the wharfinger, or the baker, or the cartman, or the hackney-coachman, pursues a public employment and exercises 'a sort of public office,' these plaintiffs in error do not. They stand, to use again the language of their counsel, in the very 'gateway of commerce,' and take toll from all who pass. Their business most certainly 'tends to a common charge, and is become a thing of public interest and use.' Every bushel of grain for its passage 'pays a toll, which is a common charge,' and, therefore, according to Lord HALE, every such warehouseman 'ought to be under public regulation, viz., that he . . . . take reasonable toll.' Certainly, if any business can be clothed 'with a public interest, and cease to be *juris privati* only,' this has been. It may not be made so by the operation of the Constitution of Illinois or this statute, but it is by the facts."

The answer to the remarks thus made has already been given, and they may be further answered by saying that the cases of the common carrier, the innkeeper, etc., are exceptional to the general rule declaring that business relations of one man with another can not be made compulsory.

"It is a part of every man's civil rights that he be left at liberty to refuse business relations with any person whomsoever, whether the refusal rests upon reason, or is the result of whim, caprice, prejudice or malice." [Cooley on Torts, 278.]

Commenting on the same topic, it is said by another author: "Business relations must be voluntary in order to be consistent with civil liberty. An attempt of the State to compel one man to enter into business relations with another,

can only be justified by some public reason or necessity.  In an ordinary private business relation, the State can not constitutionally interfere, whatever reason may be assigned for one's refusal to have dealings with another.  It is no concern of the State or of the individual, what those reasons are.  It is his constitutional right to refuse to have business relations with a particular individual, with or without reason.  But there are cases in which it has long been held to be within the scope of legislative authority to interfere with, and compel, the formation of these business relations.  The common law of England, and of this country, has for centuries justified this power of control over common carriers and innkeepers. No man is compelled to become a common carrier or innkeeper; but if he holds himself out to the world as such, he is obliged to enter into business relations with all, under impartial and reasonable regulations.  The common carrier must carry for all, within his regular line of business, and the innkeeper must provide accommodation for all who come to him, as long as he has room for them.  These two cases have for so long a time been recognized as exceptions to the general rule, in respect to the voluntary character of business relations, that the reasons for them are rarely, if ever, demanded, and certainly not questioned.  But a determination of the constitutional reasons for these exceptions, if there are any, will help to discover the limitations of legislative power in respect to other kinds of business."  [Tiedeman's Lim. Pol. Pow., sec. 92.]

So that it is only on the basis of the exercise of the police power, and that exercise based on certain exceptional conditions, that a person engaged in some *quasi* public business and enjoying some privilege or immunity incident to such business, or where he has dedicated his property to a public use,

Vol. 159 mo—28

that he can be brought under governmental control in relation to such property or business and its regulation.

As aptly remarked by Mr. Justice FIELD, in his dissenting opinion: "One may go, in like manner, through the whole round of regulations authorized by legislation, state or municipal, under what is known as the police power, and in no instance will he find that the compensation of the owner for the use of his property has any influence in establishing them. It is only where some right or privilege is conferred by the government or municipality upon the owner, which he can use in connection with his property, or by means of which the use of his property is rendered more valuable to him, or he thereby enjoys an advantage over others, that the compensation to be received by him becomes a legitimate matter of regulation. Submission to the regulation of compensation in such cases is an implied condition of the grant, and the State, in exercising its power of prescribing the compensation, only determines the conditions upon which its concession will be enjoyed. When the privilege ends, the power of regulation ceases. Jurists and writers on public law find authority for the exercise of this police power of the State and the numerous regulations which it prescribes in the doctrine already stated, that every one must use and enjoy his property consistently with the rights of others, and the equal use and enjoyment by them of their property. 'The police power of the State,' says the Supreme Court of Vermont, 'extends to the protection of the lives, limbs, health, comfort, and quiet of all persons, and the protection of all property in the State. According to the maxim, *sic utere tuo ut alienum non laedas,* which, being of universal application, it must, of course, be within the range of legislative action to define the mode and manner in which every one may so use his own as not to injure others.' [Thorpe v. Railroad, 27 Vt. 149.] 'We think it a

settled principle growing out of the nature of well-ordered civil society,' says the Supreme Court of Massachusetts, 'that every holder of property, however absolute and unqualified may be his title, holds it under the implied liability that his use of it shall not be injurious to the equal enjoyment of others having an equal right to the enjoyment of their property, nor injurious to the rights of the community.' " [Commonwealth v. Alger, 7 Cush. 84.]

As pointed out in the opinion just quoted from, Chancellor KENT, when treating of the protecting care which the Constitution throws over private property, says: "But though property be thus protected, it is still to be understood that the law-giver has the right to prescribe the mode and manner of using it, so far as may be necessary to prevent the abuse of the right, to the injury, or annoyance of others, or of the public. The government may, by general directions, interdict such uses of property as would create nuisances and become dangerous to the lives, or health, or peace, or comfort of the citizens. Unwholesome trades, slaughter-houses, operations offensive to the senses, the deposit of powder, the application of steam-power to propel cars, the building with combustible materials, and the burial of the dead, may all be interdicted by law, in the midst of dense masses of population, *on the general and rational principle that every person ought so to use his property as not to injure his neighbors, and that private interests must be made subservient to the general interests of the community.*" [2 Kent 340.]

Having made the quotations just above, Mr. Justice FIELD proceeds to say: "The citations show what I have already stated to be the case, that the regulations which the State, in the exercise of its police power, authorizes with respect to the use of property are entirely independent of any question of compensation for such use, or for the services of

the owner in connection with it.    There is nothing in the character of the business of the defendants as warehousemen which called for the interference complained of in this case. Their buildings are not nuisances; their occupation of receiving and storing grain infringes upon no rights of others, disturbs no neighborhood, infects not the air, and in no respect prevents others from using and enjoying their property as to them may seem best.    The legislation in question is nothing less than a bold assertion of absolute power by the State to control at its discretion the property and business of the citizen, and fix the compensation he shall receive.    The will of the Legislature is made the condition upon which the owner shall receive the fruits of his property and the just reward of his labor, industry and enterprise. 'That government,' says STORY, 'can scarcely be deemed to be free where the rights of property are left solely dependent upon the will of a legislative body without any restraint.    The fundamental maxims of a free government seem to require that the rights of personal liberty and private property should be held sacred.'    [Wilkeson v. Leland, 2 Pet. 657.]    The decision of the court in this case gives unrestrained license to legislative will."

Judge COOLEY in commenting on the "Police Power of the States," says:    "The police of a State, in a comprehensive sense, embraces its whole system of internal regulation, by which the State seeks not only to preserve the public order and to prevent offenses against the State, but also to establish for the intercourse of citizens with citizens those rules of good manners and good neighborhood, which are inculcated to prevent a conflict of rights and to insure to each other uninterrupted enjoyment of his own so far as is reasonably consistent with a like enjoyment of rights by others."    [Const. Lim. (6 Ed.), 704.]

"The limit to the exercise of the police power in these

cases must be this: The regulations must have reference to the comfort, safety, or welfare of society. . . . . The maxim, *sic utere tuo ut alienum non laedas,* is that which lies at the foundation of the power." [Ib. 710.]

Further on the eminent author quotes from and discusses the Munn case, and in doing so, says: "What circumstances shall affect property with a public interest is not very clear. The mere fact that the public have an interest in the existence of the business, and are accommodated by it, can not be sufficient, for that would subject the stock of the merchant, and his charges, to public regulation. The public have an interest in every business in which an individual offers his wares, his merchandise, his services, or his accommodations to the public; but his offer does not place him at the mercy of the public in respect to charges and prices. If one is permitted to take upon himself 'a public employment, with special privileges which only the State can confer upon him, the case is clear enough." [Ib. 736.] He then proceeds to state:

"In the following cases we should say that property in business was affected with a public interest: 1. Where the business is one the following of which is not of right, but is permitted by the State as a privilege or franchise. Under this head would be comprised the business of setting up lotteries, of giving shows, etc.; of keeping billiard tables for hire, and of selling intoxicating drinks when the sale by unlicensed parties is forbidden; also the cases of toll-bridges, etc. 2. Where the State, on public grounds, renders to the business special assistance, by taxation or otherwise. 3. Where, for the accommodation of the business, some special use is allowed to be made of public property or of a public easement. 4. Where exclusive privileges are granted in consideration of some special return to be made to the public. Possibly there may be other cases." [Ib. 738.]

But it is quite observable that Munn's case does not fall within any of the categories which are mentioned in the list just quoted, although that case was necesarily under criticism in the very definition of instances where legislation would be constitutional.

Elsewhere, Judge COOLEY touches on the same subject by saying: "The general rule undoubtedly is, that any person is at liberty to pursue any lawful calling, and to do so in his own way, not encroaching upon the rights of others. This general right can not be taken away. It is not competent, therefore, to forbid any person or class of persons, whether citizens or resident aliens, offering their services in lawful business, or to subject others to penalties for employing them." [Ib. 744, 745.]

And in treating in this connection, of the regulation of business charges and the power of the State in this regard, he makes these observations: "In the early days of the common law it was sometimes thought necessary, in order to prevent extortion, to interfere, by royal proclamation or otherwise, and establish the charges that might be exacted for certain commodities or services. The price of wages was oftener regulated than that of anything else, the local magistrates being generally allowed to exercise authority over the subject. The practice was followed in this country, and prevailed to some extent up to the time of independence. Since then it has been commonly supposed that a general power in the State to regulate prices was inconsistent with Constitutional liberty." [Ib. 734.]

Similar observations respecting the regulation of prices of labor, manufactures and commodities by the different States before the American Revolution, and of the abandonment of such regulations after our independence was achieved, and Federal and State Constitutions were framed and adopted, are

to be found in an interesting and instructive address delivered before the State Bar Association two years ago by Hon. G. A. Finkelnburg, in which after speaking of such regulations and their discontinuance when more rational ideas of the personal rights of individual citizens began to prevail, he says: "In other words, it was assumed to be a part of the natural and civil liberty guaranteed by American institutions to form business relations and to make contracts free from State interference, and this was thought to include the right of everyone to ask for his wares or services whatever price he was able to get and others were willing to pay." [32 Am. Law Rev., 503.]

Of course, isolated cases, sporadic instances, perhaps, may be found of statutes making regulations of the sort, but they are extremely scarce; and it is to the last degree doubtful whether such an enactment is yet. to be found lingering obsoletely on the statute books of any of our States; certainly it is not enforced.

The Supreme Court of Illinois, in Munn's case, when speaking of the power to "make needful rules and regulations respecting the use and enjoyment of property," speaks of familiar instances in which the exercise of it in the State has been unquestioned, and among them, "in delegating power to municipal bodies to regulate charges of hackmen and draymen and the weight and price of bread." Whereupon Judge COOLEY says: "Regulating the weight of bread is common, and necessary to prevent imposition; but regulating the price of bread we should suppose would now meet with such resistance anywhere, as would require a distinct determination upon its constitutional rightfulness. How the baker can have the price of that which he sells prescribed for him, and not the merchant or the day laborer, is not apparent. Indeed, to admit the power seems to render necessary the recognition of the principle that there is and can be no limit to legislative inter-

ference, but such as legislative discretion from time to time
may prescribe." [Const. Lim., 736.]

And if the extensive nature and magnitude of the busi-
ness is to authorize legislative interference with the rates of
prices charged, and thus "affect with a public interest" the
property employed in such business, as is the evident theory
which bore with great weight on the mind of the court of ul-
timate resort, then in addition to numerous instances sug-
gested by Judge Cooley and by Justices Field and Brewer
where legislative interferences would logically follow the rule
adverted to, may be mentioned the case of the farmers of this
country whose labors on many million fields supply not only
their own native land, but a large portion of the civilized
world with corn, wheat, pork and beef; surely the products
of these farms on which they labor, if not the farms them-
selves, are "affected with a public interest," for, in the lan-
guage of the Federal Supreme Court: "Property does
become clothed with a public interest when used in a manner
to make it of public consequence, and to affect the community
at large. When, therefore, one devotes his property to a use
in which the public has an interest, he, in effect, grants to the
public an interest in that use, and must submit to be con-
trolled by the public for the common good. He may with-
draw his grant by discontinuing the use; but, so long as he
maintains the use, he must submit to the control." [Munn
v. Illinois, 94 U. S. 126.]

If the property of these farmers is not "used in a manner
to make it of public consequence and affect the community.
(indeed the world), at large," if they do not "devote their
property to a use in which the public has an interest" (a very
great interest), and thereby "in effect grant to the public an
interest in that use," it is difficult to conceive of a case where
"property does (not) become clothed with a public interest,"

and if thus "clothed," then according to the rule laid down, the right of the legislature of each state to regulate and to settle the prices of each bushel of wheat and of corn, and of each pound of beef and pork, can not, for a moment, be gainsaid or denied. Their business is certainly of "public consequence," as but for the labors of the farmers, the elevators of this country, and the mills, and indeed all manufactories would stand still, and all commerce with foreign nations cease, to say nothing of other and greater calamities incident to a cessation of farming operations, and in consequence a cessation of a food supply.

Contrasted with such a business, which is truly a "virtual monopoly," all other human occupations fall into insignificance. Assuredly then, the business of farming is necessarily a "devotion of property to a use in which the public has an interest," and its pursuit, "in effect grants to the public an interest in that use," and this being the case, submission to public control as to rates, *a fortiori,* follows. But he would indeed be regarded as a bold innovator, if not a madman, who, keeping within the lines marked out in Munn's case, and following the premises there laid down, to their logical conclusion, should offer a bill establishing the maximum rates at which wheat, pork, etc., could be sold, or merchandise or wares of the shoemaker or the potter or the blacksmith; certainly all of these products of labor do "become clothed with a public interest," because "used in a manner to make them of public consequence, and affect the community at large." It is not easy to see how they could be used in any *other* manner.

In the State Supreme Court in defense of the decision as to regulation of prices, the case of regulating interest on money is instanced. But at common law, taking any interest on money was called usury, was a crime, punishable by ecclesiastical censures during life, being regarded by canon law

a mortal sin, and if after death one were found an usurer while living, all his chattels were forfeited to the king and his lands escheated to the lord of the fee.    [1 Hawk. P. C., Cap. 82.]

Afterwards, Parliament made it lawful to take a limited rate of interest, but it is said that this was not on the theory of legislation arbitrarily fixing the price for the use of property, but of granting a privilege which the common law denied. Judge COOLEY is of opinion that usury laws are not sustainable on principle.    [Princip. Const. Law (3 Ed.), 260.]

It was asserted in the State Supreme Court that so long as one retains title and possession of his property, he is not deprived of his property within the meaning of the fourteenth amendment.    The "destruction must be, for all substantial purposes, total."    This doctrine was echoed by the higher court.    The latter court seems to regard it as a matter of regret that the word "deprive" used in the above amendment was not therein "defined."    Apart from the fact that the same word had long before been employed in the Constitutions of the several States, in fact or in substance (2 Story Const., sec. 1940), and the word itself, in article 5 of the original Constitution, and in article 5 of the amendment thereto, and apart from the fact that it is not customary in framing an organic law to define the words used in composing it, the standards of our language, as well as judicial decisions, may be consulted; turning to those standards, we find that the word "deprive" "conveys the idea of either taking away that which one has or withholding that which one may have." [Crabb's Synonymes.]    Other standards of our language define the word "deprive," "To take something from; to keep from acquiring, using or enjoying something." [Standard Dictionary.]    Deprive, "To take away; end, injure or destroy." [Cent. Dictionary.]    And the synonyms of "injure," are:    "To do harm to; inflict dam-

age or detriment upon; impair or deteriorate in any way."
[Ib.]

Turning to judicial decisions, we find that in Pumpelly
v. Green Bay Co., 13 Wall. 166, it was held that the flooding
of a man's land by constructing a dam across a river, under
authority of a State law, was a taking within the prohibition,
and required compensation to be made to the owner of the land
thus flooded in order to meet the demands of the Constitution,
and that it was not necessary that property should be abso-
lutely *taken* in the narrowest sense of that word, to bring the
case within the constitutional provision; that consequential in-
jury was in many cases a sufficient basis on which to invoke
the protection of the fundamental law, and that serious inter-
ruption of the common and necessary use of property is such
as will be equivalent, under the Constitution, to a taking.

This court reached a similar conclusion under the Con-
stitution of 1865, "that no private property ought to be taken
or applied to public use without just compensation," where
the city built a dike out into the river several hundred feet,
thus filling up with mud the channel at that point, thereby
cutting off the plaintiff, a riparian owner, from his customary
access to the stream where his landing was. [Myers v. City,
82 Mo. 367.]

It is familiar law that the fee of land will pass by deed
which grants the rents, issues and profits of the land men-
tioned [3 Washb. (5 Ed.), 406], and the same method of de-
scription holds good in a devise. [Schouler, Wills (3 Ed.),
sec. 503.] And so of a devise of the income of land. [Ryan
v. Allen, 120 Ill. 648; Parker v. Plummer, Cro. Eliz. 190.]
This was so in the days of Lord COKE, who, when treating of
this rule of description, said: "For what is land but the
profits thereof?" [Coke on Litt. 4 b.]

So that, it results that "to deprive one of the use of his

land is depriving him of his land" (SUTHERLAND, J., in People v. Kerr, 37 Barb. 399). Such deprivation may be partial or total, but, in either case, compensation, under constitutional guarantees, is an inseparable incident. (Of course, cases of mere incidental injury are not included in these remarks.)

These observations drawn and deduced from the authorities cited, find ample and felicitous illustration in the case of Eaton v. Railroad, 51 N. H. 504. In that case the railroad corporation, claiming to act under legislative authority, removed a natural barrier situated south of E.'s land, which theretofore had completely protected E.'s meadow from the effects of floods and freshets in a neighboring river. In consequence of this removal, the waters of the river, in times of floods and freshets, sometimes flowed on to E.'s land, carrying sand, gravel, and stones thereon. Held, that this was a taking of E.'s property, within the meaning of the constitutional prohibition; and that the Legislature could not authorize the infliction of such an injury without making provision for compensation.

In discussing the points presented by the record, Judge JEREMIAH SMITH delivered an opinion which for close analysis and exhaustive research, is seldom equaled. Among other things, he said: "The vital issue then, is, whether the injuries complained of amount to a taking of the plaintiff's property, within the constitutional meaning of those terms. . . . . The constitutional prohibition (which exists in most, or all, of the States) has received, in some quarters, a construction which renders it of comparatively little worth, being interpreted much as if read—'No person shall be divested of the formal title to property without compensation, but he may, without compensation, be deprived of all that makes the title valuable.' To constitute a 'taking of property,' it seems to have sometimes

been held necessary that there should be 'an exclusive appropriation,' 'a total assumption of possession,' 'a complete ouster,' an absolute or total conversion of the entire property, 'a taking the property altogether.' These views seem to us to be founded on a misconception of the meaning of the term 'property,' as used in the various State Constitutions.

"In a strict legal sense, land is not 'property,' but the subject of property. The term 'property,' although in common parlance frequently applied to a tract of land or a chattel, in its legal signification 'means only the rights of the owner in relation to it.' 'It denotes a right . . . . over a determinate thing.' 'Property is the right of any person to possess, use, enjoy, and dispose of a thing.' [SELDON, J., in Wynehamer v. People, 13 N. Y. 378, p. 433; 1 Blackstone Com., 138; 2 Austin on Jurisprudence (3 Ed.), 817, 818.] If property in land consists in certain essential rights, and a physical interference with the land substantially subverts one of those rights, such interference 'takes,' *pro tanto*, the owner's 'property.' The right of indefinite user (or of using indefi-· nitely) is an essential quality or attribute of absolute property, without which absolute property can have no legal existence. 'Use is the real side of property.' This right of user necessarily includes the right and power of excluding others from using the land. [See 2 Austin on Jurisprudence (3 Ed.), 836; ELLS, J., in Walker v. Railroad, 103 Mass. 10, p. 14.] From the very nature of these rights of user and of exclusion, it is evident that they can not be materially abridged without, *ipso facto*, taking the owner's 'property.' ·If the right of indefinite user is an essential element of absolute property or complete ownership, whatever physical interference annuls this right takes 'property,' although the owner may still have left to him valuable rights (in the article) of a more limited and circumscribed nature. He has not the same

property that he formerly had.   Then, he had an unlimited right; now, he has only a limited right.   His absolute ownership has been reduced to a qualified ownership.   Restricting A.'s unlimited right of using one hundred acres of land to a limited right of using the same land, may work a far greater injury to A. than to take from him the title in fee simple to one acre, leaving him the unrestrained right of using the remaining ninety-nine acres.   Nobody doubts that the latter transaction would constitute a 'taking of property.'   Why not the former?

"If, on the other hand, the land itself be regarded as 'property,' the practical result is the same.   The purpose of this Constitutional prohibition can not be ignored in its interpretation.   The framers of the Constitution intended to protect rights which are worth protecting, not merely empty titles, or barren insignia of ownership, which are of no substantial value.   If the land, 'in its corporeal substance and entity' is 'property,' still, all that makes this property of any value is the aggregation of rights or qualities which the law annexes as incidents to the ownership of it.   The constitutional prohibition must have been intended to protect all the essential elements of ownership which make 'property' valuable.   Among these elements is, fundamentally, the right of user, including, of course, the corresponding right of excluding others from the use.   [See COMSTOCK, J., in Wynehamer v. People, 13 N. Y. 378, p. 396.] . . . . . .

"The principle must be the same whether the owner is wholly deprived of the use of his land, or only partially deprived of it; although the amount or value of the property taken in the two instances may widely differ.   If the railroad corporation take a strip four rods wide out of a farm to build their track upon, they can not escape paying for the strip by the plea that they have not taken the whole farm.   So a par-

tial, but substantial restriction of the right of user may not annihilate all the owner's rights of property in the land, but it is none the less true that a part of his property is taken. Taking a part 'is as much forbidden by the Constitution as taking the whole.   The difference is only one of degree; the quantum of interest may vary, but the principle is the same.' (See 6 Am. Law Review, 197, 198; LAWRENCE, J.; in Nevins v. City of Peoria, 41 Ill. 502, p. 511.)"     [Ib. 511, 512.]

A ruling in which, in similar circumstances, a like result was reached, has occurred in England.   [Lawrence v. Railroad, 20 L. J. N. S. 293; s. c., 2 Eng. Law and Eq. 265, cited Angell, Water Courses (7 Ed.), sec. 331a.]

"Depriving an owner of property of one of its essential attributes, is depriving him of his property within the constitutional provision."     [People v. Otis, 90 N. Y. 48.]

As the right to the use of property is all that makes it valuable, and there may be a partial deprivation of such use equally demanding compensation as would a total deprivation, then it must also follow that a legislative and compulsory diminution of "the price of the use of property" (to phrase it as does the learned Chief Justice)   must be equally as obnoxious to constitutional prohibitions as a similar diminution or deprivation of the use itself.   It would seem nothing could be more logically clear than this.

Both in the State Supreme Court and in that of the Nation it was ruled that the fixing of a reasonable compensation for the use of property was wholy a *legislative* and not a *judicial* question, that is, a maximum in rates beyond which the owner could not go; and that the only redress against these arbitrary legislative edicts was:     *"For protection against abuses, by legislatures, the people must resort to the polls, not to the courts."*   According to this, if the owner of a water mill should have the stream which turns it diverted by legisla-

tive authority so as to injure or ruin his business, so long as he is left in peaceful possession, and his title is untouched, he has not, according to the State Supreme Court, had his constitutional rights invaded, and according to the Federal Supreme Court, if the stream has been only *partially* diverted, and he has water enough left him to grind *one* bushel a day, where he ground *forty* before, he is not entitled to compensation for his loss nor to due process of law to ascertain it; the question has simply resolved itself into one of *legislative expediency.*

This position as to regulating rates by law was not, however, long maintained; it was abandoned in subsequent cases, holding that "the element of reasonableness, . . . . is eminently a question for judicial investigation, requiring due process of law for its determination." [Railway v. Minnesota, 134 U. S. 418.]    To the like effect are Reagan v. Trust Co., 154 U. S. 362; Railway v. Gill, 156 U. S. 649, and other cases.

But the court has never yet ventured to fix what rates would be reasonable; though "judicial protection," is certainly more preferable than "resort to the polls."

This change in position would appear quite a modification of the original doctrine.    The case of Budd v. New York, 117 N. Y. 1, was a case of a "floating elevator," but the same doctrine was announced as in Munn's case, where the elevators were stationary.    Mr. Justice PECKHAM (with whom concurred another member of the court), delivered a most exhaustive and instructive dissenting opinion in which are reviewed a great array of authorities all bearing on the subject under discussion and all opposed to Munn's case.    When the cause reached the final tribunal (143 U. S. 549) Mr. Justice BREWER, in dissenting, said with great force and aptness (*rem acu tetigit*):

"The vice of the doctrine is, *that it places a public interest in the use of property upon the same basis as a public use of property.*" And in the course of his dissent in discussing the doctrine above referred to, he took occasion to very pertinently say: "The paternal theory of government is to me odious. The utmost possible liberty to the individual, and the fullest possible protection to him and his property, is both the limitation and duty of government. If it may regulate the price of one service, which is not a public service, or the compensation for the use of one kind of property which is not devoted to a public use, why may it not, with equal reason, regulate the price of all service, and the compensation to be paid for the use of all property? And if so, 'Looking Backward' is nearer than a dream."

In concluding his opinion, in which Mr. Justice FIELD and Mr. Justice BROWN concurred, the learned Justice expressed the hope: "I believe the time is not distant when the evils resulting from this assumption of a power on the part of government to determine the compensation a man may receive for the use of his property, or the performance of his personal services, will become so apparent that the courts will hasten to declare that government can prescribe compensation only when it grants a special privilege, as in the creation of a corporation, or when the service which is rendered is a public service, or the property is, in fact, devoted to a public use."

In his dissenting opinion in Budd's case (117 N. Y. 1), Mr. Justice PECKHAM noticed the fact that in Railroad v. Illinois, 118 U. S. 557, Mr. Justice MILLER, speaking for the court in regard to Munn's case, and what was there decided, said: "And in that case the court was presented with the question, which it decided, whether any one engaged in a *public business, in which all the public had a right to require his service,* could be regulated by acts of the Legislature in the

exercise of this public function and public duty, so far as to limit the amount of charges that should be made for such services."

But this states a very different doctrine and very different facts to those announced in the case to which it refers, because Munn was not "engaged in a public business," nor did the "public have a right to require his service."

In Brass v. Stoeser, 153 U. S. 391, the defendant owned a small elevator located on his own land; capacity, 30,000 bushels; his exclusive business was buying and selling grain, although occasionally he accommodated his neighbors with the temporary use of his bins, when those bins were temporarily empty; but yet it was held that under the rule in Munn's case, he was bound to accommodate all comers, notwithstanding the *"admitted fact that if compelled, as he was compelled by the mandate, to receive grain as tendered so long as he had storage capacity unoccupied in his elevator, his principal business and that for which he built the elevator would be utterly ruined and destroyed."* To this ruling, BREWER, FIELD, JACKSON and WHITE, JJ., dissented.

Recurring to the views of Lord HALE as heretofore quoted, it is not thought, as already stated, that those views give countenance to what is asserted of them in the principal case, nor does Judge COOLEY approve of the construction placed upon them by the court, as above pointed out. But granting that HALE's views are as extreme as represented, or that certain deductions are warranted therefrom, yet it must not be forgotten that he wrote at a time when *paternalism was in flower*, and its veritable exponent, chapter 4 of 5th Elizabeth, was in full force.

"That statute assumed to regulate the existence and determine the number of the artisans in the whole country. It provided how long one should work as an apprentice; how many there should be in proportion to journeymen; where they should

live; under what circumstances move to another neighborhood; how many hours they should labor, and for how long a time a journeyman should be employed; and, finally, it provided that wages should be assessed for the year by the justices of the peace, who were also directed to settle all disputes between masters and apprentices. By an act of the first of James I, chapter 6, the above act was extended by giving to the justices power to fix the wages, not only of journeymen and apprentices, but of all kinds of laborers and workmen.

"During this time, also, there were statutes making it a felony to export wool from England, and the exporter of sheep, rams or lambs was liable to imprisonment, the forfeiture of all his property, and to have his left hand cut off for the first offense, and for the second offense to be adjudged a felon and to suffer death accordingly. (See 8 Eliz., ch. 3; 13 and 14 Chas. 2, chap. 18). Provisions were extant forbidding exportation of hides, raw or tanned leather, and many other things, and all for the supposed benefit of the kingdom or the various interests in whose favor the legislation was enacted. (Smith's Wealth of Nations, by McCulloch, p. 292 et seq.) Laws were then in force which regulated down to the minutest detail the manner of life, and the texture of dress and the costliness thereof, and the variety of dishes upon the tables of the people; special laws determined how much land of an estate should be plowed and how much left in pasture; how much was to surround a laborer's cottage; how many sheep should be supported on a farm. (England in the Eighteenth Century, Lecky, vol. 6, p. 231 et seq.) " [Budd v. New York, 117 N. Y. loc. cit. 45.]

That HALE's views were colored by the state of the then existent statutory law, no one can doubt who has any knowledge of the nature of the human mind. Besides, when HALE wrote, the country where he wrote was under the dominion of a practically omnipotent Parliament, unfettered and unhampered by

the prohibitions of a written Constitution.   In the opinion under comment it is said:   "When the people of the United Colonies separated from Great Britain, they changed the form, but not the substance, of their government.   They retained for the purposes of government all the powers of the British Parliament, . . . . . . . so that now the governments of the States possess all the powers of the Parliament of England, except such as have been delegated to the United States or reserved by the people.   The reservations by the people are shown in the prohibitions of the Constitution."   [94 U. S. loc. cit. 124.]

Now, if by this statement it is meant to be intimated, as seems to be the case, from subsequent observations, that a State Legislature is possessed of substantially the same powers as the Parliament of Great Britain, the intimation is unfounded in, and unsupported by, recognized authority.   Discussing the essential difference between the powers of the British Parliament and those of a State Legislature, Judge COOLEY says: "It is natural, also, . . . . . . . to concede without reflection that whatever the legislature of the country from which we derive our laws can do, may also be done by the department created for the exercise of legislative authority in this country.   But to guard against being misled by a comparison between the two, we must bear in mind the important distinction already pointed out, that with the Parliament rests practically the sovereignty of the country, so that it may exercise all the powers of the government if it wills so to do; while on the other hand the legislatures of the American States are not the sovereign authority, and, though vested with the exercise of one branch of the sovereignty, they are nevertheless, in wielding it, hedged in on all sides by important limitations, some of which are imposed in express terms, and others by implications which are equally imperative."   [Cooley Const. Lim., 102.]

Touching this matter it is said by the author of the Insti-

tutes: "The power and jurisdiction of Parliament, says Sir EDWARD COKE, is so transcendent and absolute that it can not be confined either for persons or causes, within any bounds. . . . . . . . It can, in short, do everything that is not naturally impossible. . . . . . . . True it is, that what the Parliament doth, no authority upon earth can undo." . . . . . . . . (4 Inst. 36; 1 Black Com., 161). "The strong language in which the complete jurisdiction of Parliament is here described is certainly inapplicable to any authority in the American States, unless it be to the people of the States when met in their primary capacity for the formation of their fundamental law," etc.    [Cooley Const. Lim., 103.]

Parliament "is at once a legislature and a constitutional convention."    [1 De Tocqueville's Democracy in America, c. 6, p. 103; Eaton v. Railroad, *supra*, loc. cit. 516.]

Munn's case has met with many criticisms of an adverse character in addition to those above noted.    Speaking of the doctrine it establishes, Tiedeman, in reviewing that case, remarks:    "I say this rule has been laid down for the first time, although the Chief Justice refers to it as a long established rule, and refers to Lord HALE as his authority.    A careful study of HALE's writings will disclose the fact that to no case does he refer in which the business does not under the law constitute a privilege, more or less of a legal monopoly. There is nothing in his writings to justify the application of his rule or his reasoning to a business, which is a virtual monopoly, but is not made so by law."    [Tiedeman's Lim. Pol. Pow:, pp. 230, 231.]

Vol. 16 Am. Law. Regis. (N. S.) 526, published the opinion as well as a very copious note, citing many authorities, which concludes thus:    "No other court has ever held that a Legislature could fix the rate at which a private person performing a service, in which he has no other monopoly than that

which the possession of superior means for conducting his business gives to him, and no aid from the public, should be compensated for the service.    No such case is cited in the opinion. Therefore, none need be cited contra."

And criticism has not been confined to this side of the Atlantic; even in the land from whence our common law is derived, Mr. Bryce, a lawyer and statesman of distinguished ability and author of the great work, "The American Commonwealth," in reviewing the case, thinks that the decision was, perhaps, more the effect of public opinion in its action upon the court than of a strict adherence to legal principles; and while, as he says, not presuming to question its correctness, yet adds that it evidently represents a different view of the sacredness of private rights, and of the powers of the Legislature, from that entertained by Chief Justice MARSHALL and his associates.    [See 1 Bryce's American Commonwealth, p. 267.]

Much was said in the opinion in question, about a "virtual monopoly." These words were, it is true, used by Lord ELLENBOROUGH in 12 East, but those words must be construed with reference to the facts then presented.    It was a clear case of a *legal* monopoly; for there the London Dock Company was *mentioned by name* in the warehousing act, and was the only company into whose warehouses wines could be stored, without prior payment of excise duties.

There can be no such thing as a legal monopoly unless based upon a license or privilege allowed by the king, etc. (4 Bl. Com. 159.    To same point are:    Charles River Bridge v. Warren Bridge, 11 Pet. 420, 606, 607, per STORY, J.; Railroad v. Richmond, 26 Iowa 191, 201, 202; affirmed, 19 Wall. 584; In re Greene, 52 Fed. Rep. 104), and necessarily, the party to whom the license is granted, takes it on such conditions as the license-granting power may see fit to impose.

VI.   It has been thought best to consider at large the doctrine announced in the case relied on, as well as opposing views in order to endeavor to discover whether Munn's case, granting it correctly decided, has any application to the case at bar. Following a familiar rule, the general words employed in that opinion, should be restricted to the particular facts of that case and should not be extended to other cases which could not have been in the mind of the court at the time (Cohens v. Virginia, 6 Wheat. 264, 399, per MARSHALL, C. J.; Plumley v. Massachusetts, 155 U. S. 461); nor has that court so extended them to any case of similar sort to the one before us.

The controlling element which gave origin to the opinion relied on seems to have been that of a *monopoly*. But of course, that element can have no place in the present instance, because respondent has been granted no special or exclusive right or privilege by the State, nor has it received any benefits from that quarter.    Nor has the respondent acquired any additional right by reason of its incorporation, to that it possessed before. Every one is at liberty to gather news; and the fact that one has greater facilities or finances for gathering and transmitting news, or that the business has grown into one of great magnitude, wide-spread in its ramifications, or that mere incorporation has been granted a company organized for the purpose of gathering news, does not and can not of itself give the State the right to regulate what before incorporation, was but a natural right.   [Tiedeman's Pol. Pow., sec. 93, p. 234.]

Were the rule otherwise than as just stated, the effect would be to deprive a person of a right to pursue any lawful calling or to contract where and with whomsoever and at what price he will.   The right thus to contract can not be interfered with; it is part and parcel of personal liberty, and therefore under the protection of section 30, article 2 of our State Constitution and of the fourteenth amendment of the Constitution

of the United States, as heretofore quoted. [Cooley's Const. Lim., 944, 945; Ib. on Torts, 278; State v. Loomis, 115 Mo. 307 and cases cited; State v. Julow, 129 Mo. 163 and cases cited. To like effect see Allgeyer v. Louisiana, 165 U. S. 589, 591; Williams v. Fears, 21 Sup. Ct. Rep. 128, 129, 130.]

If relator's position as to its right to compel respondent to turn over to it the results of its labors and researches after news, is correct, then by the same token, any citizen could compel any newspaper to admit him as a subscriber; or as news is a synonym of information, intelligence, knowledge, then a lawyer profoundly versed in his profession, could be compelled to yield his treasures of erudition to some less fortunate member of the bar, of the type described by Swift:

> "Who knows of law nor text nor margent,
> Calls Singleton his brother sargeant."

And even if the business of respondent can justly be deemed a monopoly, then relator's efforts should be directed toward the destruction of that monopoly and not towards obtaining the mandate of this court compelling relator's admission into that "real genuine article," as counsel are pleased to designate it.

Conceding respondent's business to be in truth a monopoly, would furnish an all-sufficient reason and answer for denying the relief relator asks; because the addition of one more monopolist to a monopolistic organization, would not lessen its monopolistic features, or abate its vicious tendencies. But there is nothing here on which a monopoly can attach. The business is one of mere *personal service; an occupation.* Unless there is "property" to be "affected with a public interest," there is no basis laid for the fact or the charge of a monopoly. [See, on this point, Morris v. Colman, 18 Ves. 437 (per Lord ELDON);

Mogul S. S. Co. v. McGregor, 23 Law R. Q. B. D. 598, 609 (per Lord Esher); Express Cases, 117 U. S. 1, 21, 24; Railway v. Pullman Car Co., 139 U. S. 79, 89-91.]

Nor is there any more property in "news" to-wit, "information," "intelligence," "knowledge," than there is in the "the viewless winds," until the "guinea stamp" of a copyright is impressed upon its external similitude, thus giving it one of the elements of property, to-wit, governmental protection for a limited period. That there is no monopoly even in fact, in the business in which respondent is engaged, is shown in the clearest possible manner by this record. Other news-gathering agencies have the same facilities over the wires of the Western Union Telegraph, as has the Associated Press; the terms of the telegraph company are uniform as to all organizations, and such other agencies are at work in their occupation, and it would seem with great success. Hundreds of daily newspapers in every quarter of the Union, leaders in point of circulation in their respective localities, look for their news supplies to some other agency than that of respondent. Some publishers accustomed to receive reports from respondent have discontinued their business relations with it and gone to some rival or competing organization. The New York Sun, repeatedly urged to join the respondent, has continuously declined. And the relator-company, notwithstanding the allegations of its petition, that its paper could not be published with a profit without the aid of the Associated Press, Mr. Lowenstein, the Star's business manager, gives it as his opinion under oath, that "the Star prints a better budget of news than any of its rivals."

For the purpose of obtaining its supplies of news, the Star is affiliated with the New York Sun or Laffan News Bureau, and concerning the efficiency of that service, Mr. Laffan testifying, says: "It has no equal at all, from our point of view." And answering the question whether "as a

matter of fact is it better than the Associated Press?" answered: "Of course it is; everybody knows that." And Mr. M. E. Stone, general manager of the Associated Press, says that the Scripps-McRae service is an excellent one.

If these statements are to be taken as true, and so they will be regarded for the purposes of this case, relator has no standing in court, because Lord ELLENBOROUGH in the Allnutt-Inglis case, *supra*, after commenting on the fact that the London Dock Company's warehouses were the only places where wines of importers could be bonded, went on to say: "If the Crown should hereafter think it advisable to extend the privilege more generally to other persons and places, so far as that the public will not be restrained from exercising a choice of warehouses for the purpose, the company may be enfranchised from the restriction which attaches upon a monopoly." [12 East, loc. cit. 540.]

And because, further, a court in circumstances as above related, will not award a discretionary writ as now here prayed, for the mere purpose of determining an empty and barren technical right in behalf of a petitioner; it will "let well enough alone."

Subsidiary to considerations heretofore mentioned, may be suggested others tending in the same direction. In Mathews v. Associated Press, 15 N. Y. Supp. 887, defendant, a corporation organized under the act "to incorporate the Associated Press of the State of New York" (Chap. 754, Laws of 1867), adopted a by-law prohibiting its members from receiving or publishing "the regular news dispatches of any other news association covering a like territory and organized for a like purpose." A suspension of all the rights and privileges of the association was provided as a penalty for a violation of said provision. In an action to restrain defendant from enforcing this penalty, held, that the association had power to enact the

by-law; that it was not objectionable either as unreasonable and oppressive, or as tending to restrain trade and competition and to create a monopoly.

It appeared that while defendant only appoints and engages agents, in the strict sense of the term, in the State of New York, by virtue of contracts with other associations, it receives from them news collected from the principal portions of the civilized world. Plaintiffs are also members of, and they publish the news received from, another press association which collects its news, by its own agents, from substantially the same territory. Held, further, that this action of plaintiffs came within the prohibition of the by-law and authorized defendant to enforce the penalty.

The court in general term among other things said: "The business of collecting the news of the day and furnishing reports of it to the press for a compensation has become a very well known and important industry. It can scarcely be called a branch of trade. There is no right of property in the news itself. That is neither bought nor sold. Any man who hears it may make such use of it as he can for his own advantage or may communicate it to others. So he may make a business of collecting news and furnishing reports of it to the newspapers or to such of them as will compensate him for his trouble. The work is commonly done in the locality of each newspaper by its own reporters employed and paid for that purpose........ In this case the agents are employed by the defendant, the Associated Press of the State of New York, acting for all the publishers who are comprised in its membership. As to all these, the charter and by-laws of the corporation constitute the contract between themselves and between them and the association. Among the provisions of that contract is one to the effect that none of the members shall contract with any other news association to employ for them agents for

the procurement of news within the same territory as that in which agents of the defendant association are employed. This contract between the members of the association is mutual and is for the common benefit, and so is supported by a sufficient consideration. It is for the common benefit, because the efficiency of the association depends upon the number and activity of its agents, and these largely upon the extent of its revenues, from which salaries are paid, and that, in turn, upon the number of its patrons; so the building up of competitors which must draw off from its patronage will necessarily detract from the extent and value of its work. The contract, therefore, of the associates with each other and of those with the association, which is embodied in the by-law in question, seems to us not to exceed the proper bounds of self-protection and not to be unreasonable nor obnoxious to any principle which has been invoked for its condemnation."

This ruling of the Supreme Court was unanimously affirmed by the Court of Appeals, Mr. Justice PECKHAM delivering the opinion, who afterwards delivered the opinion of the court in United States v. Freight Ass'n, 166 U. S. 290.

In a prior case, Dunlap's Cable News Co. v. Stone, 15 N. Y. Supp. 2, the contention was made that news-gathering was a "public business."

The Cable News Company was a corporation engaged in collecting news and selling the same to all newspapers applying therefor. The New York Associated Press was an association of newspaper proprietors also engaged in the business of collecting news and furnishing it to newspapers. The association had a by-law to the effect that none of its members should take news from any other agencies. For violation of this by-law by a number of publishers the association threatened to discontinue its service to them. The suit was to enjoin the association from such proposed action. The plaintiff alleged that

the business engaged in by the parties was "a public business and that both plaintiff and the said New York Associated Press are therefore under an obligation to serve the entire public; and that it is essential for the proper conduct of a newspaper and for the interests of its readers, subscribers and advertisers, and for the interest of the public, that such newspaper should be at liberty to avail itself of all sources of information, and combine, if it think best, the intelligence and information furnished by the various agencies instituted for that purpose."

A motion for an injunction *pendente lite* was denied. On appeal to the general term the ruling below was sustained. The court said: "The plaintiff's application amounted to nothing more nor less than an attempt to restrain the defendants from transacting their lawful business in their own way, lest in doing so plaintiff's rival business should be injured or diminished. The defendants have a perfect right to limit the sale of the news which they collect to those who contract to deal exclusively with them. They are private individuals, dealing, it is true, with a large public, but governed by no corporate duty or statutory obligations. They certainly owe no duty to the plaintiff, which is a foreign corporation, attempting to compete with them, and with whom they have no privity or relations of any kind."

In the latter case the defendant association was not incorporated; in the former it was, but both cases were treated alike in this respect.

And it has been determined that: "A voluntary association, whether incorporated or not, has, within certain well-defined limits, power to make and enforce by-laws for the government of its members. Such by-laws are ordinarily matters between the association and its members alone, and with which strangers have no concern." [Live Stock Com. Co. v. Live Stock Exch., 143 Ill. 210.]

The charter of respondent, after emendation, is couched in these words: "The object for which it is formed is to buy, gather and accumulate information and news; to vend, supply, distribute and publish the same." Under the terms of its charter respondent owes no duty to relator, since it possesses no greater right in regard to the gathering and purchase, etc., of news than its incorporators possessed as individuals, before the act of incorporation (authorities *supra*). But on the basis that the charter, by-laws, etc., place respondent on the plane of any other corporation in charge of a "public utility," relator asserts that respondent's business is to be regarded in the same light precisely, as a railroad, telegraph or telephone company; that it involves a public franchise. But in the Live Stock Com. Co. v. Live Stock Exch., *supra,* it was ruled that: The mere fact that the business of a particular market owned by a private corporation has become so large as to influence the commerce of a large section of the country, will not give the courts any power to declare such market public, and impressed with a public use, or to apply to it any rules of public policy peculiar to that class of markets. That power belongs alone to the legislative department of the State. [See Express Cases, *supra;* Railroad v. Railroad, 41 Fed. Rep. 559, 569 (Per CALDWELL, J.); Interstate Commerce Commission v. Railway, 167 U. S. 479, 499; Railway v. Central Stock Yards Co., 45 N. J. Eq. 50.]

In making this ruling, not only was Munn's case on the *point involved,* cited with approval, but in addition thereto, Ladd v. Southern Cotton Press Co., 53 Tex. 172, was cited, and its language approvingly quoted:

"We know of no authority, and none has been shown us, for saying that a business strictly *juris privati* will become *juris publici,* merely by reason of its extent. If the magnitude of a particular business is such, and the persons affected

by it are so numerous, that the interests of society demand that the rules and principles applicable to public employments should be applied to it, this would have to be done by the Legislature (if not restrained from doing so by the Constitution), before a demand for such use could be enforced by the courts."

It is not pretended here that such legislation as would make respondent corporation's business *juris publici,* has been enacted, granting that such legislation could have any extraterritorial effect (as to which see Vawter v. Railroad, 84 Mo. 679; State v. Gritzner, 134 Mo. 512, and cas. cit.; Harris v. White, 81 N. Y. loc. cit. 544).

It is needless to discuss, in this connection, cases which bring into view the duties of railroad, telegraph and telephone companies, since those companies, having accepted legislative favors, right of eminent domain, etc., must shoulder the burdens along with the benefits, and their business becomes, by such acceptance, *ipso facto, publici juris.* Not so, however, with respondent, which was granted no privileges, asks none, and can not, therefore, be burdened with conditions such as pertain to common carriers and the like.

As to the case of Minnesota Tribune Co. v. Associated Press, 83 Fed. Rep. 350, it seems to recognize the validity of such contracts by the Associated Press, as are the subject of complaint here. But if this is not so, we prefer the ruling and reasoning on this point in Matthews' case.

In regard to Stock Exchange v. Board of Trade et al., 127 Ill. 153, much relied on by relator: For many years the Board of Trade had been accustomed to furnish to all customers, the telegraphic reports as to daily and hourly conditions of the grain and other markets; having done so for such a long time, it undertook suddenly to disrupt those long continued business relations and leave the plaintiff, a corporation

engaged in the commission business, without any means of conducting its ordinary and long-established business; and upon this basis it was very properly held that plaintiff was entitled to injunction to prevent the threatened disruption of business. This was the very gist of the decision in that case, and we need not say whether we fully indorse much of the language and of the reasoning used in arriving at the conclusion reached; and this reason, among others, occurs, why we need not, and that is, respondent has never entered into business relations with relator, and consequently there are no such relations to be severed, and no such injurious results can occur in this case as in the one referred to.

Relative to the recent decision by the Supreme Court of Illinois in the Inter-Ocean Publishing Company v. The Associated Press, to which our attention has been called: The Inter-Ocean Company was engaged in publishing two newspapers in Chicago, the Daily and the Weekly Inter-Ocean. A contract was entered into between the parties as to furnishing news in accordance with the by-laws of the Associated Press. This contract the Inter-Ocean Publishing Company violated by procuring and publishing news obtained from other news concerns located in the city of New York. Being notified by the Associated Press to appear to answer such charges of violation of contract, the Inter-Ocean Publishing Company resorted to injunction to prevent expulsion for violation of the by-laws of the Associated Press, which formed part and parcel of the contract between the parties. The Inter-Ocean Publishing Company admitted, in its bill for injunction, that it had violated its contract, and seemingly, by way of excuse, alleged that it could not obtain all the news from the other contracting party, and so was forced to engage the services of other news-gathering associations. Answer was filed, and upon hearing had, the bill was dismissed for want of equity,

and this decree was affirmed in the appellate court. But when the cause reached the Supreme Court, the decrees of the lower courts were reversed and the cause remanded with directions to enter a decree as prayed. The rulings in that case were:

1. The by-law and contract created a monopoly.

2. That it was necessary to publish news from other sources to make a check on the defendant.

3. That the by-law tends to restrict competition, because it prevents members from purchasing news from any other source.

4. That the contract and by-law are void as being beyond the power of the defendant to make.

5. That the "obligation (of the defendant) to serve the public is one not resting on contract, but grows out of the fact that it is in the discharge of a public duty, or a private duty, which has been so conducted that public interest has attached thereto."

And sixth, that the fact that the defendant possessed the right to use the power of eminent domain as to telegraph and telephone lines, although not exercised, contributed to determine the character of its corporate organization. And on these grounds was based the ruling that the defendant must furnish everyone applying, with the same service of news. The above decision is evidently at war with the rulings in the Live Stock Commission Case, *supra*, where "the amount of business annually transacted at said stock-yards is such as to constitute the market thus established the largest live-stock market in the world." If the facts just related did not impress the business with a public use, it is difficult to conceive what facts could do so, and in addition to the utterances heretofore quoted in the Live Stock Commission case, the court there also said: "The views here expressed do not conflict with what was decided in Munn v. Illinois, 94 U. S. 113.

Vol. 159 mo—30

The question raised and decided in that case was as to the constitutionality of the act of the Legislature of this State, declaring certain grain elevators to be public warehouses, and prescribing rules for their management, and fixing maximum charges for the storage and handling of grain. There the legislative department had interposed and declared the public use, and the court, in holding the act constitutional, held merely that the legislative power had been properly exercised. This was the only question, having any relevancy here, presented in that case or which the court undertook to decide, and the discussion of the evidence showing that the business carried on in said grain elevators was of such character that it had in fact become impressed with a public use, was only for the purpose of showing that a condition of things existed which justified the Legislature in passing the statute then under consideration." [143 Ill. loc. cit. 239.]

That case clearly announces that it is necessary in cases like the present one, that the *Legislature* should declare that the business "had in fact become impressed with a public use;" something which, as there stated, the courts were powerless to declare. But that case was wholly ignored in the case under comment.

For these reasons, besides those already given during the course of this investigation, we decline to follow that case or regard its rulings authoritative.

VII.   There is one remaining point to be considered and that relates to the anti-trust laws. So far as concerns those of Illinois they are not of force in this State, and as to those of the United States, they must be enforced in another forum.

The law on the subject in this State prohibits "any pool, trust, agreement, combination," etc., "to regulate or fix the price of any article of manufacture, mechanism, merchandise, commodity, convenience, repair, any product of mining, or any

article or thing whatsoever, or the price or premium to be paid for insurance of property," or to fix or limit the production of the things whose price may not be regulated or fixed.   [R. S. 1899, section 8965.]

Nothing is discovered in this section which is at all applicable to the business in which respondent is engaged. Whether we apply to the words of the statute the rule of *noscitur a sociis* (McNichol v. U. S. Merc. Rep. Ag., 74 Mo. 457); or that of *ejusdem generis* (State v. Schuchmann, 133 Mo. 111), the result must be the same.

And there is an especial reason why the ruling in this regard should be a strict one, and this is because the statute is highly penal.

Moved by these considerations, we deny the peremptory writ.

All concur.